## CITY OF WINFIELD v. WICHITA NATURAL GAS CO. et al.

(Circuit Court of Appeals, Eighth Circuit. August 17, 1920.)

No. 5461.

1. **Removal of causes ⊙⟳48—Distinct causes of action against different parties constitute "separable controversies."**

   Where the record in a suit discloses separate and distinct causes of action, upon either of which a separate suit could have been maintained, and the determination of neither of which is essential to the disposition of the other, there are "separable controversies," within the meaning of the acts of Congress for the removal of causes.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Separable Controversy.]

2. **Removal of causes ⊙⟳57—Only indispensable parties should be considered in determining removability.**

   In determining the right to remove causes, indispensable parties only should be considered.

3. **Removal of causes ⊙⟳57—Company supplying gas not indispensable party to suit between city and distributing company.**

   In a suit to compel a gas company to continue to furnish gas to the inhabitants of a city at the rate specified in the franchise, the company which contracted to supply gas to the distributing company for distribution at that rate is not a necessary party.

4. **Removal of causes ⊙⟳57—Gas distributing company not indispensable party to determination whether supply company had assumed obligations to city.**

   In a suit to compel the supplying of gas to a city at the franchise rates, the corporation which had the franchise to distribute the gas is not an indispensable party to the determination of the question whether the company supplying the gas had assumed an obligation to the city to supply gas at the stated rate, so that controversy could be removed, though the distributing company was a domestic corporation.

5. **Removal of causes ⊙⟳61—Facts, not pleaded conclusions, determine removability.**

   In determining removability of a cause, the allegations of specific facts control the general conclusions deduced therefrom, so that removal will not be denied because of allegations that the foreign and domestic corporations were jointly interested and had a joint liability, where the contract between those corporations was pleaded and did not establish such liability.

6. **Appeal and error ⊙⟳954(4)—Dissolution of interlocutory injunction reviewable only for abuse of discretion.**

   The dissolution of an interlocutory injunction, like the granting of such injunction, is intrusted to the sound discretion of the court of original jurisdiction, and the appellate court can review such dissolution only on proof of a violation of the rules or principles of equity, or of an abuse of discretion.

7. **Gas ⊙⟳14(1)—Contract to supply gas to distributing company held not to assume obligation to city.**

   The company, which contracted with a holder of a franchise for the supply of gas to the inhabitants of a city at specified rates to supply gas

---

to the holder of the franchise, did not thereby assume an obligation to the city or its inhabitants to supply the gas to them at the stated rate.

8. **Gas** ⊚—6—**Purchaser of distributing company, owning stock of new corporation, not bound by contract of latter.**

A gas supply company, which purchased at receiver's sale the assets of a corporation holding a franchise to distribute gas at stated rates, and transferred such assets to a newly organized corporation, of which it owned all the stock, and which assumed the obligations of a franchise, did not thereby bind itself to the city to continue to furnish gas at the specified rate.

9. **Corporations** ⊚—406(1)—**Supply company, using gas distributing company as agent, bound only to extent of its contract with agent.**

Where a company supplying natural gas used another corporation as its agent to distribute the gas to the inhabitants of a city under a contract between the two corporations, the supply company was bound by the contract of its agent with the city only to the extent of the obligations assumed in its contract with the agent.

10. **Gas** ⊚—14(1)—**Improvements in reliance on gas supply do not extend liability of supplying company beyond its contract.**

The fact that the inhabitants of a city had made improvements in reliance on a supply of natural gas at rates stated in the franchise to the distributing company does not impose on the supplying company any obligation to continue to supply gas beyond the terms of its contract with the distributing company.

11. **Gas** ⊚—13(3)—**Supply company, if joint adventurer with distributing company, is not bound by latter's franchise.**

A company supplying natural gas to the holder of a city franchise for distribution in the city, if a joint adventurer with the distributing company, is not thereby bound to furnish gas to an extent not expressly provided for in the contract.

12. **Corporations** ⊚—215—**Sole stockholder not bound in equity by contract with corporation.**

Courts of equity recognize the sole stockholder of a corporation as distinct from the corporation, and do not hold the stockholder bound by the contracts of the corporation.

Appeal from the District Court of the United States for the District of Kansas; John C. Pollock, Judge.

Suit by the City of Winfield against the Wichita Natural Gas Company and others. From an order dissolving an interlocutory injunction, complainant appeals. Affirmed.

The city of Winfield has appealed from an order of the court below, which dissolved an interlocutory injunction that forbade the defendants below, the Wichita Natural Gas Company, a corporation of Delaware, engaged in producing, buying, and selling natural gas, and the Winfield Natural Gas Company, a corporation of Kansas, engaged in the business of distributing and selling natural gas to consumers in the city of Winfield, from raising the price of natural gas to consumers for domestic purposes in that city above 30 cents per 1,000 cubic feet, from discontinuing the supply of gas to the plaintiff and the inhabitants of the city, and forbade the Wichita Company from raising the price of gas to the Winfield Natural Gas Company above two-thirds of the 30-cent rate per 1,000 cubic feet fixed therefor by the contract between them.

When the suit was commenced, when the injunction was issued, and when it was dissolved, the Winfield Natural Gas Company was distributing and selling natural gas to the city and its inhabitants under Ordinance No. 776 of the city of Winfield, which had been accepted by the grantee, Pattison, on November 13, 1906. This ordinance provided that the grantee should supply

⊚—For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

natural gas for domestic purposes to the inhabitants of the city of Winfield for a price not exceeding 30 cents per 1,000 cubic feet. By several assignments the rights and privileges of Pattison under this ordinance had been conveyed, before this suit was brought, together with the distributing mains and pipes in the streets and alleys of Winfield, to the Winfield Natural Gas Company, which had accepted them and had assumed the obligations to the city, which conditioned the grant therein of the right to use the streets for its mains and pipes. The Winfield Naural Gas Company was, and had been since 1909, obtaining its supply of gas from the Wichita Company under a contract, dated November 25, 1906, between that company and the Winfield Gas Company, taken in the name of W. P. Hackney. This Winfield Gas Company was a corporation which in 1906 had a plant in Winfield for the distribution of artificial gas, which it subsequently changed and used to distribute the natural gas of the Wichita Company. It became insolvent. A receiver was appointed for its property, which was sold under a decree of court and vested in the Winfield Natural Gas Company in June, 1909, and the old Winfield Company then ceased to function.

On June 2, 1912, the Wichita Company and the Winfield Natural Gas Company made a supplemental agreement, by which they modified the terms of the Hackney contract of June 25, 1906. In the early part of the year 1919 the Wichita Company gave notice to the Winfield Natural Gas Company that the natural gas in the field from which it had agreed to furnish it in the supply contract was exhausted; that the expense of providing it from more distant fields was so great that it could not and would not longer supply it for two-thirds of 30 cents per 1,000 cubic feet, the price fixed therefor in the Hackney contract, nor for less than 45 cents per 1,000 cubic feet; that the supply contract was illegal, and did not by its terms require it so to do; and that it would cease to supply natural gas to the Winfield Natural Gas Company at an early date unless the 45-cent rate was adopted and used.

Thereupon the city of Winfield brought this suit in the district court of Cowley county, Kan., prayed that the defendants be enjoined from changing the rate at which they were furnishing the gas to the city and its inhabitants, and from ceasing to furnish gas on account of any failure to pay any sums in excess of the 30-cent rate, and applied for and obtained the interlocutory injunction. The Wichita Company removed the case to the court below on the ground that there was a separable controversy between it and the plaintiff. A motion to remand was made and denied, the Wichita Company moved for a dissolution of the injunction, and that motion was heard on the complaint, affidavits, and testimony and was granted.

The terms and provisions of the ordinance contract between the city and the Winfield Natural Gas Company, of the supply contract, of the supplemental agreement between the Winfield Natural Gas Company and the Wichita Company. and of the notice of the Wichita Company to the Winfield Natural Gas Company are the same in material respects, mutatis mutandis, as the terms and provisions of those instruments in the case of Hutchinson Gas & Fuel Co. v. Wichita Natural Gas Co., 267 Fed. 35, in which the opinion is handed down herewith. Reference to the statement and opinion in that case is here made for a more extended recital of those terms, which it is thought it is useless to repeat in this case.

S. C. Bloss and A. M. Jackson, both of Winfield, Kan. (J. E. Torrance, of Winfield, Kan., on the brief), for appellant.

Joseph G. Carey, of Wichita, Kan., and Robert A. Brown, of St. Joseph, Mo. (John H. Brennan, of Bartlesville, Okl., and R. R. Vermilion, Earle W. Evans, and W. F. Lilleston, all of Wichita, Kan., and H. O. Caster, of Bartlesville, Okl., on the brief), for appellees.

Before SANBORN and CARLAND, Circuit Judges, and TRIEBER, District Judge.

SANBORN, Circuit Judge (after stating the facts as above).
[1, 2] Counsel first argue that 'the order dissolving the injunction
should be reversed for want of jurisdiction of the District Court, be-
cause there was no separable controversy between the city and the
Wichita Company, a corporation of Delaware, while the other defend-
ant was a corporation of Kansas, a corporation of the same state as
was the plaintiff.

"Separate and distinct causes of action disclosed by the record in a single
suit, upon either of which a separate suit could have been maintained, and
the determination of neither of which is essential to the disposition of the oth-
er, constitute separable controversies, within the meaning of the acts of Con-
gress."

"In a determination of the jurisdiction of the national courts, and the right
to remove causes of action to them, indispensable parties only should be con-
sidered, because all other parties may be dismissed and disregarded, if their
presence would oust or restrict the jurisdiction or the right."

These rules were stated and the authorities sustaining them were
cited many years ago by this court. Boatmen's Bank v. Fritzlen, 135
Fed. 650, 658, 663, 68 C. C. A. 288, 296, 301. The opinion and deci-
sion in that case was twice challenged and affirmed in the Supreme
Court. Fritzlen v. Boatmen's Bank, 198 U. S. 586, 25 Sup. Ct. 803,
49 L. Ed. 1174; Fritzlen v. Boatmen's Bank, 212 U. S. 364, 371, 29
Sup. Ct. 366, 53 L. Ed. 551. The later decisions of the national courts
have not disturbed these rules. Texas Co. v. Central Fuel Co., 194
Fed. 1, 10, 114 C. C. A. 21, 31.

[3] Neither of the defendants is bound in morals or in law to supply
natural gas to the city of Winfield for 30 cents per 1000 cubic feet, or
for any other price, unless it has agreed with that city so to do. The
only cause of action the complaint in this case presents against the
Winfield Company is that by its purchase, receipt, and acceptance in
June, 1909, of the conveyance to it of the property of the old Winfield
Gas Company, and of its rights and privileges under the ordinance
contract, and by its subsequent use thereof, it assumed the obligations
of that company under the ordinance contract to supply natural gas to
the city and its inhabitants at the 30-cent rate. If the complaint disclos-
es any controversy between the Winfield Natural Gas Company and the
city, it relates to and involves this contract of assumption, and to the
trial and determination of that issue the Wichita Company is neither an
indispensable, necessary, nor proper party.

[4] There is no averment in the complaint that the Wichita Com-
pany ever made any direct agreement with the city, or with any of its
inhabitants, to sell, deliver, furnish, or supply to it, or any of them,
natural gas at 30 cents per 1000 cubic feet, or at any other price, or
that the city or its inhabitants ever gave to that company any fran-
chise, consideration, or grant for any such agreement. The complaint
contains averments, however, that the Wichita Company assumed the
obligation of Pattison and his successors in interest in the ordinance
contract so to do: First, by supplying gas to the receiver of the old
Winfield Company, and through him to the city and its inhabitants,
under and pursuant to the terms of the Hackney supply contract, dated

November 25, 1906; second, by paying, as the principal bondholder and creditor of the old Winfield Company, the purchase price at the sheriff's sale of that company's property to John D. Neely, its president, in June, 1909, causing its officers and agents to incorporate the Winfield Natural Gas Company, causing the title to the property, rights, and privileges of the old Winfield Company to be vested in this new corporation immediately after the sheriff's sale, and taking, holding, and owning the capital stock of that company; third, by using the Winfield Natural Gas Company as its agent to send its gas through the mains and pipes of that company in the city of Winfield, to the city and its inhabitants, in accordance with the terms of the supply contract of November 25, 1906, which was assumed and ratified by the Winfield Natural Gas Company and is in full force and effect; fourth, by the facts that the city and its inhabitants have known of the ordinance contract, of the supply contract, and of the furnishing of gas thereunder, and have made expensive improvements in reliance thereon.

If the Wichita Company has not assumed and agreed by one or more of these acts thus pleaded to perform the original agreement of Pattison in the ordinance contract to supply natural gas to the city and its inhabitants at not exceeding the 30-cent rate, it is not bound under the complaint in this action to the city so to do, and the only controversies between the Wichita Company and the city are whether or not it has made any of these alleged assumptions. Each of the controversies concerning these assumptions, however, is conditioned by the acts, writings, and sayings of the Wichita Company, and by those alone. The trial and the determination of these controversies cannot adjudge or affect the issue whether or not, by the Winfield Natural Gas Company's purchase and use of the property, rights, and privileges of the old Winfield Company it assumed and agreed to perform the conditions of the ordinance contract. It was not and is not, therefore, an indispensable or necessary party to the trial and adjudication of the controversies between the city and the Wichita Company.

Those controversies arise from, and their determination is conditioned by, alleged agreements of assumption by the Wichita Company of the obligations of the grantee of the ordinance contract and its successors, distinct and separate from the alleged agreement of assumption thereof by the Winfield Natural Gas Company by its purchase, acceptance, and use of the property and franchises of the old Winfield Company. The causes of action alleged against the Wichita Company, on the one hand, and that averred against the Winfield Natural Gas Company, on the other hand, were separate and distinct, conditioned by separate alleged contracts, upon either of which a separate suit might have been maintained, and the determination of none of the alleged causes of action against one of these corporations was essential to the determination of any of the causes of action against the other. Their controversies with the city were therefore separable, and the court below had jurisdiction of this suit.

[5] The contention of counsel for the city and the authorities cited in support thereof to the effect that these controversies were inseparable, because the two companies were jointly associated together, be-

cause each was interested in the business they were conducting under the supply contract, because under that contract the Winfield Natural Gas Company was the agent of the Wichita Company, because it was controlled by the latter by its ownership of the Winfield stock, and because a joint liability is alleged and a joint injunction is prayed, have received careful attention and meditation; but, in pleading, general averments are always controlled and limited by specific allegations regarding the same subject-matters. Boatmen's Bank v. Fritzlen, 135 Fed. 650, 659, 68 C. C. A. 288, 297; Moyer v. Ft. Wayne, C. & L. R. Co., 132 Ind. 88, 31 N. E. 567, 568; Reynolds v. Copeland, 71 Ind. 422; Pinney v. Fridley, 9 Minn. 34 (Gil. 23). It is the controversies, the facts pleaded in the complaint portray, not the legal conclusions the pleader alleges result from those facts, nor his averments of joint liability or joint action, nor his prayer for relief, that determine whether or not the controversies disclosed by the complaint are separable. The material facts pleaded in this complaint have been thoughtfully considered in view of this rule of pleading, and the conclusion is irresistible that the controversies between these parties which they disclose are separable.

[6] We come, then, to the question: Is there clear proof in the record in this case that the dissolution of the interlocutory injunction by the court below was an abuse of its discretion? for the granting or dissolution of an interlocutory injunction is intrusted, not to the appellate court or its discretion, but to the sound discretion of the court of original jurisdiction, guided by the applicable rules and principles of equity; and its decision may not be reversed without plenary proof of a violation of some of these rules or principles, or of an abuse of that discretion. American Grain Separator Co. v. Twin City Separator Co., 202 Fed. 202, 206, 120 C. C. A. 644, 648.

Unless the Wichita Company contracted with the city to supply it and its inhabitants with natural gas at the 30-cent rate by some written or verbal promise, or by acts equivalent thereto, it is not lawfully bound so to do, and it has the right to refuse to sell or deliver it at that rate, or at any other rate. There is no allegation in the complaint that it ever made any written or verbal promise to the city or its inhabitants to that effect. The complaint contains averments, however, that by certain acts, which it sets forth in detail, that company assumed the obligation so to do of C. H. Pattison and his successors and assigns under the ordinance contract of 1906.

[7] In the first place, it contains averments that the Wichita Company assumed that obligation by virtue of these alleged facts: It made or assumed the Hackney supply contract of November 25, 1906, with the old Winfield Company; that contract provided that the Wichita Company would deliver to the Winfield Company at its reducing and regulating station at the city limits, as long as its wells and pipe line were capable of supplying it, not exceeding 20 years, a supply of gas sufficient to meet the demand for domestic consumption in the city of Winfield; that the Winfield Company would receive, sell, and distribute this gas through its pipes and mains to domestic consumers in Winfield at the 30-cent rate, and pay the Wichita Company two-thirds

of the proceeds of the sale, that the Winfield Company should have the exclusive agency of the Wichita Company to distribute and sell its gas in Winfield, and that it would distribute and sell the natural gas of no other party therein; that the Winfield Company at its own expense would own and maintain the distributing system, receive the gas from the Wichita Company at the latter's reducing station, transport and distribute it through its mains and pipes, sell and deliver it, and collect payment for it, but that the title to the gas should remain in the Wichita Company until it was sold and delivered to the consumers. In 1906–07 the Winfield Company, in order to transform its distributing plant for artificial gas into a plant for the distribution of natural gas, obtained large quantities of pipe, fittings, materials, payments for labor, and some money from the Wichita Company, which supervised the making of these changes, and thereby the Winfield Company became indebted to the Wichita Company in the sum of $114,935.08. The Winfield Company made a mortgage on its plant for $100,000 and a second mortgage for $30,000. It delivered to the Wichita Company $51,000 of its first mortgage bonds and $25,000 of its second mortgage bonds in part payment of its indebtedness. These mortgages covered its distributing plant and its franchise rights under the ordinance contract. They were made in 1907, and the Winfield Company was then receiving and distributing natural gas to the city and its inhabitants under the Hackney supply contract, which it had assumed. On December 11, 1908, the Winfield Company had become insolvent, and the Wichita Company brought a suit upon the debt of the Winfield Company to it, for a receiver, the sale of its property, and the distribution of its proceeds to its creditors, and a receiver was appointed who operated its plant until the sale under the decree of the court of its property and its franchise rights for $75,045 on June 1, 1909. From March 20, 1907, until July, 1909, the Wichita Company supplied its natural gas to the city and the inhabitants of Winfield first, and until the appointment of the receiver, through the old Winfield Company, and thereafter through the receiver until the sale under the decree.

Now, counsel for the city claim and have alleged in the complaint, that by the facts and acts just stated, the Wichita Company assumed and agreed to perform the obligation of Pattison and his successors under the ordinance contract to furnish natural gas to the city and its inhabitants at the 30-cent rate until October 23, 1926; but one who thoughtfully reads the complaint cannot fail to see from it that the only way in which the Wichita Company supplied gas to the city or its inhabitants through the old Winfield Company or the receiver, during these years, was through the performance of its Hackney supply contract of November 25, 1906, which had been assumed by the Winfield Company, and under the terms of that contract. That agreement evidenced and governed the relation of the Wichita Company to the Winfield Company, and the ordinance contract covered the relation of the Winfield Company to the city and its inhabitants. Neither the city nor any of its inhabitants was a party to the Hackney supply contract of the Wichita Company. They were parties to the ordinance contract with the Winfield Company and to no other. They purchased their gas

from the Winfield Company, and paid for it under that contract to which the Wichita Company was not a party; and there is no rational method of escape from the conclusion that neither the Hackney supply contract nor the performance of it by the Wichita Company, by delivering gas to the Winfield Company and its receiver, nor any of the acts and facts which have been recited, ever wrought any assumption by the Wichita Company of any of the obligations of Pattison or of any of his successors under the ordinance contract.

[8] In the second place, the city alleges that the Wichita Company assumed those obligations by these alleged acts; at the sheriff's sale of the property and franchise of the old Winfield Company, Mr. Neely, the president of the Wichita Company, bought that property for the Wichita Company and as its agent, used the money and funds of that company to pay for it, that company became the owner thereof, including the rights and privileges granted by the ordinance contract, and it became its duty to supply the city and its inhabitants with natural gas thereunder at the 30-cent rate until October 23, 1926. The sale was on June 21, 1909. The Wichita Company, through its agents, organized and procured a charter of incorporation for the Winfield Natural Gas Company, which was filed with the secretary of state on June 23, 1909. The Wichita Company's agents were the first stockholders and directors of the new company. The Wichita Company organized that corporation to take over, and it caused Mr. Neely to turn over and vest in that company, the title to the property bought by him at the sheriff's sale. The Wichita Company took and still owns all the stock of the Winfield Natural Gas Company. It organized that corporation to act as its agent in supplying the inhabitants of the city with gas, and it has used and is using that company as such agent to perform the obligations of Pattison and his successors under the ordinance contract. The Winfield Natural Gas Company assumed and ratified the Hackney supply contract with the Wichita Company of November 25, 1906, the latter company has treated the former company as a substituted party for the old Winfield Company, and the Hackney supply contract of 1906 is in full force and effect between the Wichita Company and the Winfield Natural Gas Company.

But these acts and facts tend rather to prove the intention and careful provisions not to assume rather than an assumption by the Wichita Company of the obligations of Pattison and his successors under the ordinance contract. If it had intended to agree with the city to assume those obligations, it would naturally have purchased the property and franchise of the old Winfield Company in its own name and vested their title in itself, and then have ended the supply contract of November 25, 1906. If, as alleged, it became the owner of the property and franchise held by the old Winfield Company by the sale, it was then the owner of that company's interest in the Hackney supply contract at the same time. It could then have merged them and ended the supply contract. The legal presumption is that it did not intend to and did not do so, and the fact that the Winfield Natural Gas Company assumed the obligations of the old Winfield Company thereunder, and

that the supply contract remained in force between it and the Wichita Company, constituted plenary proof that it did not do so.

In considering these transactions, the fact must be constantly remembered that the Wichita Company owed no duty to supply gas to the city or its inhabitants, and that it had no contract with the city or its inhabitants to assume any obligation to them to furnish gas, and that there is no fraud or deception alleged in any of these transactions. It had the right to refuse to assume, and to prevent assumption, of the obligations of its insolvent debtor to the city, and this is what it did; and it did it in the ordinary, natural, and normal way, by organizing a corporation that made that assumption, and thereby prevented its stockholder, the Wichita Company, from so doing. Stripped of legal inferences and conclusions of the pleader, this was the transaction: The Wichita Company was the largest creditor of the old insolvent Winfield Company. To save something from its wreck, as the judicial sale of its debtor's property approached, it organized the new corporation, the Winfield Natural Gas Company, to take its property and assume its obligations to the city under the ordinance contract and to the Wichita Company under the Hackney supply contract. It caused its president to bid in the property of the insolvent debtor at the sheriff's sale and to convey it to the new company. It paid the sheriff the purchase price with its funds and money, doubtless chiefly, with the mortgage bonds of its debtor which it held, and in payment by the new company for this property of the debtor, the title to which it caused Neely to vest in the new company, it took the stock of that company.

It is not denied that one may purchase the property and franchise of a public utility corporation, and so use it or refuse to use it as to make himself liable for the obligations of the former holder to operate it; but it is the common practice at the judicial sales of property and franchises of insolvent railroad companies, water companies, light companies, and other such corporations for one or more of their creditors, or a committee for them to organize a new corporation to take this property, for one or more of the creditors or the committee to bid in the property at the sale, for the creditors to pay the purchase price chiefly with the securities of the insolvent debtor which they hold, for the bidder or bidders to convey to and vest the title to the property and franchises in the new corporation, which accepts and uses them, and for the creditors or some of them to take the stock of the new company in payment therefor. No decision or opinion of any court has been cited or discovered to the effect that such bidders at such sales, who constitute in fact a mere conduit through which to pass the property and franchise rights to the new corporation, or the creditors who pay the purchase price therefor and take the stock of the new company, thereby assume the obligation of the railroad company perpetually to operate its railroad, or of the other like corporations to discharge their franchise duties to the public after the new corporation has assumed and entered upon the discharge of them. This method of transferring the property and franchises to a new corporation was devised and has been practiced for the express purpose of preventing such a result, and this court will hesitate long before holding that Mr. Neely or the

Wichita Company, by adopting this common device to prevent the assumption of such obligations, assumed the obligations of the insolvent Winfield Company under the ordinance contract of 1906 to furnish natural gas to the city of Winfield at the 30-cent rate from June, 1909, when the Winfield Natural Gas Company took the property and assumed the obligations of the ordinance contract until October 23, 1926.

[9] The averment of the complaint that the Wichita Company organized the Winfield Gas Company to act as its agent, and that it is using and has used it as such agent to perform the obligations of Pattison and his successors, has not escaped our memory. But the allegation that the Winfield Natural Gas Company assumed the obligations of the old Winfield Company under the Hackney supply contract shows in what way the Wichita Company used the Winfield Natural Gas Company as its agent, and that under and by means of that contract and its performance it refused to assume and advisedly and legally protected itself against the assumption of the obligations of Pattison and his successors under the ordinance contract. The supply contract demonstrates the fact that the Winfield Natural Gas Company was not a general agent of the Wichita Company, and that it was not authorized to agree on its behalf to assume any of the obligations of the ordinance contract, for its powers were defined and strictly limited by the supply contract. So it is that the facts pleaded in the complaint regarding the purchase of the property and franchises of the old Winfield Company at the judicial sale, the payment for the purchase, the organization of the Winfield Natural Gas Company, the vesting in it of the title to that property and its franchises, and the taking and ownership of the stock of the new company by the Wichita Company are insufficient to indicate that the Wichita Company thereby assumed any of the obligations of Pattison or his successors under the ordinance contract of 1906 to the city or its inhabitants. They tend rather to establish clearly that, as it had the right to do, it did not intend to make such an assumption, and by its acts and its supply contract it sedulously and legally protected itself against such an assumption.

In the third place, the city alleges that the Wichita Company has assumed the obligation of Pattison and his successors by these alleged facts: Since July, 1909, it has, by virtue of the terms of the ordinance contract and the acceptance thereof, and through the agency of the Winfield Natural Gas Company, occupied the streets, alleys, and avenues of that city, by maintaining therein its gas mains, pipes, etc., formerly belonging to the old Winfield Company, and carrying its gas through these mains and pipes, and selling it to the inhabitants of the city at the 30-cent rate. But while the complaint recites the acceptance by the Wichita Company of the ordinance contract, it also alleges the facts which the pleader claims constitute this alleged acceptance, and these alleged facts not only fail to evidence such an acceptance, but show that there was no acceptance. The complaint discloses the fact that the Wichita Company's only occupancy or use of the streets and alleys was by the fact that the Winfield Natural Gas Company distributed the gas which the Wichita Company delivered to it at the limits of the city through the mains and pipes of the Winfield Natural

Gas Company which it owned and maintained, and which the Wichita Company did not own or maintain, and the Winfield Natural Gas Company sold this gas to the inhabitants of the city under and in accordance with the provisions of the Hackney supply contract, which had been assumed by the Winfield Natural Gas Company. In view of these facts which appear in the complaint there was no assumption of the obligations of Pattison and his successors under the ordinance contract by the Wichita Company here.

[10] In the fourth place, there are averments in the complaint to the effect that the city and the inhabitants knew the conditions of the ordinance contract and the terms of the Hackney supply contract, that the Wichita Company had accepted and assumed the former, that the latter was made for the benefit of the city and its inhabitants, that these contracts were being carried out according to their terms, and that in reliance upon these facts the city and its inhabitants expended and invested large amounts in making improvements and preparing to use natural gas at the 30-cent rate, which will be greatly and irreparably depreciated in value unless the Wichita Company is compelled by the court to furnish gas to them at that rate until October 23, 1926. These allegations are found in paragraph 24 of the complaint, after the averments of the alleged facts which the plaintiff asserted effected an acceptance of the ordinance contract and an assumption of the obligations of Pattison and his successors by the Wichita Company, which for the reasons already stated are thought to be insufficient to effect any such acceptance or assumption. The averment that the supply contract was originally made by the Wichita Company, or was assumed and ratified by the Winfield Natural Gas Company, for the benefit of the city and its inhabitants, is an averment of a conclusion or belief of the pleader that is not sustained by the contract itself, or by the averments of the circumstances and conditions of its creation and performance, which tend to prove that it was made for the benefit of the parties to it, and there are no other alleged facts which tend to indicate that those who made and assumed it had any other object. If, therefore, the city and its inhabitants knew the terms of the two contracts as alleged, they knew that the Wichita Company was not bound to the city and its inhabitants to supply gas to them at the rate of 30 cents per 1000 cubic feet, that its only obligation to supply gas was to the Winfield Natural Gas Company, to supply it to the extent and on the terms stated in the Hackney contract, and, if they made improvements with this knowledge, the Wichita Company is not liable for depreciation in their value which may result from its change in the rate at which it supplies its gas, or in its failure to continue to supply it at all, unless such action is a violation of the supply contract which it made.

[11] Counsel for the city contend that the two defendant corporations are joint adventurers or coadventurers in the joint enterprise of owning, managing, controlling, and using the property and franchises involved for the city and its inhabitants. Even if they were or are, that fact would not and does not create a contract of assumption of the obligations of Pattison and his successors to the city and its inhabitants by the Wichita Company, which never assented to any such contract,

and which, to prevent such a contract and to limit its liability, made the Hackney supply contract, whereby the extent of its liability was clearly fixed. A railroad company, which owns and operates its railroad, and an independent express company, which sends its express packages and messengers over it under a contract whereby the two companies share in certain proportions the income from the express business, are joint adventurers or coadventurers in that business, in the same sense as are the two defendants here. But the express company does not thereby assume the obligations of the railroad company to the grantor of its franchise or to the public perpetually to operate its railroad for their benefit. The express company's duty and liability are conditioned by the terms of its contract with the railroad company. By the same mark the duty and liability of the Wichita Company in this case is described and fixed by the terms of the Hackney supply contract of 1906, and by those terms the Wichita Company is not bound to the city of Winfield or its inhabitants, none of whom is a party to that contract, to supply natural gas to any of them at the 30-cent rate, or at any other rate, until October 23, 1926.

The analysis and consideration of the averments of the complaint which have now been made have resulted in the conclusion that they are insufficient to show that the Wichita Company ever made or assumed any agreement with, or obligation to, the city or its inhabitants to supply natural gas to them, unless that agreement or assumption can be found in the Hackney supply contract. Two questions therefore arise: Was the Wichita Company on June 14, 1919, when the court below dissolved the injunction, bound by the Hackney supply contract, as changed by the supplemental agreement of January 2, 1912, to the Winfield Natural Gas Company, by a lawful contract, enforceable in equity, to deliver natural gas to that company at the rate fixed in that contract or at any other rate? Second, if it was so bound, was the city of Winfield the proper party to enforce that obligation?

The first of these questions must be answered in the negative; (1) because that contract was void for lack of mutuality ever after January 2, 1912, as to natural gas not delivered and accepted; and (2) because, under the complaint and the evidence in this case, the capability of the gas wells and acreage of leases in the gas belt of Kansas, described in the contract, to supply natural gas there specified, which conditioned the existence of any obligation of the Wichita Company to supply it, did not exist on June 19, 1919, and for a long time prior thereto. For the reasons for this answer, reference is made to the opinion in Hutchinson Gas and Fuel Co. v. Wichita Natural Gas Co., where this question is more exhaustively discussed.

The second of these questions must also be answered in the negative, because neither the city nor any of its inhabitants was or is a party to that supply contract, or ever became an assignee of any of the obligees of the Wichita Company thereunder, either by express assignment or subrogation.

[12] Counsel for the city, throughout the discussion of this case, have earnestly contended that the court, in the treatment of the parties to it, should ignore the difference between the rights and liabilities of

the two defendants, between the rights and liabilities of the alleged sole stockholder of the Winfield Natural Gas Company, the Wichita Company, and the rights and liabilities of the Winfield Natural Gas Company; that it should disregard the express limitations of the special agency of the Winfield Natural Gas Company for the Wichita Company created by the Hackney supply contract, treat the former as the general agent of the latter, empowered to bind it by an agreement of assumption of the obligations of Pattison and his successors, when it had no such authority; and that the court should reinstate the injunction on the theory that these parties were in effect one, and that that one ought to discharge the obligations of Pattison and his successors under the ordinance contract. If equity and justice demanded such a course of action by a court of equity, some of the contentions which counsel make might be lawfully sustained; but the complaint and evidence in this case have satisfied that equity and justice demand that this course should not be pursued, and that the court should not impose upon the Wichita Company and enforce a contract of assumption which the complaint and the evidence fail to satisfy that it ever made. The sole stockholder of a corporation is not the corporation; it is not bound by the obligations, debts, or liabilities of the corporation; it does not own, cannot sell, convey, or dispose of, the property of the corporation, or bind it by its agreement. Watson v. Bonfils, 116 Fed. 157, 167, 53 C. C. A. 535, 545; Syndicate Ins. Co. v. Bohn, 65 Fed. 165, 169, 12 C. C. A. 531, 535, 27 L. R. A. 614. Such was the legal relation of the Wichita Company to the Winfield Natural Gas Company.

The Winfield Natural Gas Company was indeed the agent of the Wichita Company. But the extent and terms of that agency were set down in plain words in the Hackney supply contract; they neither empowered nor permitted the Winfield Natural Gas Company to assume for or on behalf of the Wichita Company the obligations of Pattison and his successors under the ordinance contract. No mistake, fraud, deceit, or other equitable ground for avoidance of these legal relations of the parties has been discovered in the complaint or in the evidence. The reinstatement of the interlocutory injunction would be in effect a decree of temporary specific performance by the Wichita Company of alleged contracts which it never made, or which as to their executory parts are unenforceable and void.

The record in this case falls far short of presenting clear proof that the court below disregarded any of the applicable rules or principles of equity jurisprudence, or abused its discretion in dissolving the injunction. Its order must be affirmed; and it is so ordered.