## MUNICIPAL GAS CO. v. LONE STAR GAS CO.  (No. 9168.)*

(Court of Civil Appeals of Texas.  Dallas. Feb. 2, 1924.  Rehearing Denied March 8, 1924.)

**1. Injunction ⟨key⟩1—Granting injunction governed by same rules as apply to specific performance.**

Generally the granting of an injunction is governed by the same principles, rules, and practice as apply to specific performance.

**2. Specific performance ⟨key⟩1, 5—"Specific performance" is actual accomplishment of contract; rests on inadequacy of legal remedy.**

Specific performance is purely an equitable remedy, and jurisdiction to grant such relief is based on inadequacy and incompleteness of remedy at law and is the actual accomplishment of a contract by the party bound to fulfill it.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Specific Performance.]

**3. Specific performance ⟨key⟩32(1)—Essentials of contract.**

To warrant a decree of specific performance not only the existence of a contract binding in law must be shown, but also that it is not wanting in mutuality.

**4. Specific performance ⟨key⟩5—Inadequacy of remedy at law essential.**

A party seeking specific performance must show inadequacy and incompleteness of any available remedy at law.

**5. Specific performance ⟨key⟩6, 32(3)—Contract to furnish natural gas held mutually enforceable against both parties.**

In a suit for specific performance of a contract to furnish natural gas to plaintiff as distributor to consumers, where petition showed that at large expenditure plaintiff prepared itself to perform its obligations for the life of the contract, so that it was subject to the same decree it sought to invoke against defendant, and in the same decree in which the court could direct enforcement of defendant's affirmative promises it could direct enforcement of promises made by plaintiff, mutuality both of obligation and remedy was thereby shown.

**6. Specific performance ⟨key⟩75—Remedy at law held inadequate.**

In suit for specific performance of contracts to furnish gas for distribution to consumers where forfeiture by defendant would result in loss to plaintiff of franchises held by it in various municipalities in which it operated, and as a consequence its property would become virtually worthless and its business entirely destroyed, an absence of adequate legal remedy was thereby shown.

**7. Gas ⟨key⟩2—Railroad Commission without power of revision of pre-existing contracts independent of rate issues.**

Cox Pipe Line Bill (Acts 35th Leg. [1917] c. 30, Vernon's Ann. Civ. St. Supp. 1918, arts. 732½ to 732½m, Vernon's Ann. Pen. Code Supp. 1918, art. 1522p) does not give to the Railroad Commission power of revision over a pre-existing contract between companies producing and distributing natural gas independent of any issues or question of the making or revision of rates to consumers.

**8. Specific performance ⟨key⟩75—Performance of contract to supply gas not denied because requiring court's supervision.**

Specific performance of a contract to supply natural gas for distribution to consumers will not be denied merely because contracts therefor extend over a long period of years and would involve the court's supervision and also call for exercise of personal skill and scientific knowledge.

**9. Specific performance ⟨key⟩75, 116¾—Rule of denial of specific performance as requiring court's supervision over long period of time not determined on demurrer.**

The rule that specific performance will not be decreed where contracts show that they extend over a long period of time and would involve the court's supervision is one of decision and not of limitation of equity jurisdiction, and application thereof in suit for specific performance of contract to furnish natural gas for distribution could not be determined on demurrer.

**10. Specific performance ⟨key⟩99—Denial of decree against public utility not warranted because of violation of contract.**

Where parties to contract for furnishing natural gas for distribution were charged with knowledge that necessary public interest would demand faithful performance, equity is not warranted in denying a decree of specific performance on the ground that either party had violated a stipulation that gave the other the right of forfeiture.

**11. Parties ⟨key⟩40(2)—Interveners must have interest in subject-matter of suit.**

Before a party can intervene in a pending suit he must not only show that he is interested in the subject-matter but also that his interest is of such nature as warrants a decree in his behalf.

**12. Specific performance ⟨key⟩106(1)—Interveners not in privity with subject-matter of suit not proper parties.**

In suit for specific performance of contract to furnish natural gas for distribution where interveners were not in such privity to contracts between plaintiff and defendants as would permit granting them relief, they were not proper parties.

---

⟨key⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error in appeal of city of McKinney and Lone Star Gas Company granted April 30, 1924.

On Motion for Rehearing.

**13. Contracts ⚶127(1)—Parties may contract with reference to remedies.**

Parties may contract with reference to the remedy to be invoked in case of a breach of terms and conditions by either, providing the remedy does not contravene the law or violate public policy.

**14. Constitutional law ⚶106—Remedy contracted for becomes vested property right.**

When parties have legally contracted in reference to a mutual remedy for breach, such remedy becomes a vested property right.

**15. Corporations ⚶449—Corporation cannot contract away its duty to give public service.**

Public service corporations cannot contract, so as to endanger, or cause to be suspended or rendered impossible, the performance of duty to the public.

Appeal from District Court, Dallas County; Louis Wilson, Judge.

Action for injunction by the Municipal Gas Company against the Lone Star Gas Company, in which Levi Brashear and others intervened. From a judgment for defendant, plaintiff and interveners appeal. Reversed and remanded in part, and affirmed in part.

Chas. L. Harty, J. W. Hassell, and Merritt & Leddy, all of Dallas, and Hamp P. Abney, of Sherman, for appellants.

Lawther, Pope & Leachman and Karl F. Griffith, all of Dallas, for appellee.

JONES, C. J. This suit was instituted by appellant, Municipal Gas Company, against appellee, Lone Star Gas Company, to restrain it from declaring a forfeiture of four contracts, under which appellant purchased and received from appellee its supply of natural gas for distribution to the consumers in the territory in which it operated; to enforce the specific performance of each of the said contracts; and for temporary injunction restraining appellee from discontinuing or diminishing the supply of gas under said contracts until a final trial of the case. The suit was filed in the district court of Dallas county on June 29, 1921, and on said date the judge of the said court issued the temporary injunction as prayed for. At the time of the execution of the said contracts and at the time of the institution of this suit, appellant's charter name was "The North Texas Gas Company," but during the pendency of said suit this name was changed to "Municipal Gas Company," and, on suggestion of this fact to the court, the case proceeded in the name of the Municipal Gas Company as plaintiff.

Some time after the filing of this suit, but before its final trial, Levi Brashear, of Sherman, Grayson county Tex., was permitted by the court to file his plea of intervention,

and he is also a party appellant in this cause. By appropriate allegations this appellant set up very fully his interest in the subject-matter of this suit as a user, for domestic purposes, of the natural gas supplied him by appellant, and also set up very fully the effect a judgment in the case favorable to appellee would have upon him as such interested party. His plea of intervention was not only in his own behalf, but for all others similarly situated.

Likewise, H. B. Hennan, a resident citizen of the city of Denton, Frank J. McCoy, a resident citizen of Decatur, Tex., E. M. Thomas, a resident citizen of Ennis, Tex., and C. L. Simpson, a resident citizen of Whitesboro, Tex., by leave of the court, jointly filed a similar plea of intervention and are each a party appellant in this cause.

The city of McKinney, by leave of the court, also filed its plea of intervention, both in its own behalf as an individual user of the natural gas distributed by appellant, and in behalf of all others in like situation with like interests as itself, and especially in behalf of those citizens living within the said city of McKinney whose interests would be affected by the result of the suit. This plea of intervention alleges the interests of the said city of McKinney and the others for whom said plea of intervention was filed in the subject-matter of this suit, and the effect the final disposition of the suit, if favorable to appellee, would have on this interest.

Except for some orders increasing the injunction bond and in reference to the payment to appellee by appellant of money for gas delivered after the injunction was granted, the case remained on the docket of the trial court until September 10, 1923, when a hearing was had by the court on demurrers urged in the answer of appellee. This answer, in addition to the demurrers, was very full and complete in alleging its defensive matters to appellant's suit and to the several pleas of intervention. In said answer was also set up a cross-action against appellant for an indebtedness it claimed had arisen under the said contract.

As a result of the hearing, the trial court sustained a general demurrer to appellant gas company's petition and three special exceptions, each of which had the effect of a general demurrer. The trial court also sustained a general demurrer and various special exceptions to the various pleas of intervention. Each of the parties declined to amend, and the petition and respective pleas of intervention were dismissed by an order entered by the trial court. Appellee also dismissed without prejudice its cross-action, and the case is before this court on a duly perfected appeal by the plaintiff in the suit below and by each of said interveners.

As the final decree was rendered by the trial court upon demurrers to the sufficiency

⚶For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

of the petition of appellant gas company and the sufficiency of the pleas of intervention of appellant interveners, it is deemed advisable to make a fuller statement of the pleadings of appellants and of the contracts forming the basis of the suit than would otherwise be considered necessary. For convenience and brevity, the Municipal Gas Company will be referred to as appellant, and the other appellants as interveners.

Each of the four contracts was attached to appellant's petition as an exhibit, and adopted by reference as a part of said petition. These contracts covered the entire territory in which appellant gas company operated. The first contract was of date December 18, 1909, and covered a period of 21 years from said date. This contract was entered into between appellee and the Clayco Oil & Pipe Line Company. Appellant claimed under this contract as assignee of the above-named company. The second and third contracts were between appellee and appellant under the name of North Texas Gas Company. The first was dated August 8, 1912, and extended over a period of 15 years from said date. The third was dated April 11, 1916, and covered a period from said date until December 1, 1927. The provisions of these three contracts are identical except as to the period of time they were to run and the territory in which each was to operate. The fourth contract was dated June 7, 1919, was between appellee and appellant under the name of North Texas Gas Company, and covered a period of time from said date until January 1, 1930. It differed in some of its material provisions from the other three contracts, and will require a separate statement as to its provisions.

The first of these contracts embraced a territory consisting of cities and towns of Byers, Petrolia, Wichita Falls, Bellvue, Bowie, Alvord, Sunset, Decatur, Rhome, and other towns along appellee's pipe line system leading into the towns named. The second of said contracts embraced a territory consisting of the cities of Sherman, Denison, Denton, and towns along appellee's pipe line system leading into these cities. The third contract embraced the city of McKinney. The fourth contract embraced a territory consisting of the cities and towns of Corsicana, Hillsboro, Cleburne, Ennis, Waxahachie, Granbury, Itasca, Italy, Milford, West, and other cities and towns located on or adjacent to the pipe line system of appellee that was to serve the above-named localities.

The preamble to each of the first three contracts recites that appellee is the owner of a large quantity of leases, gas wells, and gas-producing property situated in Clay county, Tex., and is constructing a large pipe line from its field to the territory embraced in each contract, and is desirous of securing a market for its gas. It further recites that appellant is the owner of franchises authorizing it to lay mains and pipes in and through the various towns and cities named in each contract for the supply of natural gas to said cities and to all consumers within said territory, and desires to purchase and secure a supply of gas for such use in the said towns and cities; and that appellee is willing to sell and deliver to appellant all the gas it shall require for said purpose.

This is followed by a statement of the mutual contractual obligations assumed by each. That portion of same necessary for the consideration of this case is that appellee obligates itself (1) to deliver to appellant all the gas appellant requires to supply the needs of the consumers in the towns and cities to be served at a price equal to two-thirds of the gross receipts received by appellant from such consumers; that delivery will be made by means of a lateral pipe line constructed from appellee's main pipe line to a connection with appellant's pipe line just outside the limits of each town or city to be served; (2) that, if the price thus received shall be less than 20 cents per 1,000 cubic feet of gas delivered at said connecting point, then appellee shall have the right to annul that portion of the contract in reference to the price, and that payment for the gas will be made monthly on a date stipulated in each of the contracts; (3) that appellee shall not be responsible to appellant for any deficiency in the supply of gas resulting from the failure of the gas field, but appellee is bound to furnish natural gas to appellant to the full extent that it may be able to do so through the exercise of reasonable care and diligence in the acquisition of gas territory, the drilling of wells, and the transportation of natural gas through its pipe lines to said points of delivery; (4) that appellee shall have the right to delare a forfeiture of each contract, if appellant should violate any of the covenants assumed by it in favor of appellee, or should fail to perform any of the duties imposed upon appellant under the terms of the contract, provided appellee shall first give appellant at least 30 days' written notice specifying the particulars wherein it is claimed there has been a delinquency, and, if at the end of such time appellant has not remedied the delinquency so pointed out by said notice, the termination of each contract shall be deemed complete.

Appellant obligates itself (1) that it will have constructed and installed, by a specified date, a complete system of mains and pipes for the distribution of natural gas to the consumers residing in the cities and towns named in the contracts, and that this construction shall be of sufficient capacity to give efficient and adequate service to all consumers; (2) that it will accept for delivery at the points designated in the contracts, and at the price stated, all the gas necessary to supply all of its consumers; (3) that it will keep proper books in which shall be kept a

true record of all sales of gas registered by its meters and of all moneys received from the consumers for the gas used by them, and that on or before the 20th day of each and every month it will make a true and correct statement of the moneys received from the consumers for the preceding month, and on said date pay to appellee the amount shown to be due it for said month; (4) that it will at once enter into an active and diligent campaign for the education of the people in the use of natural gas and for the adoption and installation of necessary appliances for its use, and that it will extend its mains to keep pace, both with the increased use of natural gas resulting from such education and resulting from the usual increase in population of the territory served; (5) that it will at all times use reasonable diligence to maintain and operate its distributing system in such manner as will prevent unnecessary leakage, wastage, or escape of gas, and that appellee at all reasonable times shall have the right to examine and inspect its books, accounts, meters, and all appliances used in the distribution of gas; (6) that appellant shall have the right of forfeiture on account of any deficiency of appellee in reference to its obligations as is given to appellee.

There are other stipulations in each of the contracts providing for other contractual rights, and also providing a scale of prices to be charged for gas when delivered to other than domestic consumers, which is not considered necessary to the disposition of this case.

The fourth contract, while differing materially in the expression of the contractual rights given to each of the parties, is of the same general character as those described above, and it will not be necessary to give any lengthy statement of its terms.

Appellee bound itself by this contract to prosecute to completion the construction of its pipe line from the natural gas fields of Palo Pinto county, Tex., and other counties adjacent thereto, where gas is being produced, through the territory named in this contract, so that delivery could be made to appellant just outside the limits of the towns and cities to be served in the same manner that delivery is provided for in the other contracts. It obligated itself to deliver to appellee at these various junction points all the natural gas required by it to meet the demands of the various consumers at the price of 25 cents for each 1,000 cubic feet of gas so delivered; that payment for said gas was to be made on the 20th day of each month for the preceding month. Appellant obligated itself to receive at said points all the natural gas necessary for its consumers at the said stipulated price, and to make payment therefor on the above-named dates. It also obligated itself to secure all the necessary franchises from the various towns and cities named in the contract where it had

not already secured such franchises; that it would construct its mains and pipe lines sufficient in capacity to serve all consumers in said towns and cities, and it bound itself to perform substantially all the covenants that are named in the other contracts.

In this contract both appellant and appellee fixed the 31st day of December, 1920, as the time on which each would complete its constructions necessary for the distribution of gas to the consumers.

The right of forfeiture is given to each of the parties in the following language:

"If either party shall willfully violate any of the covenants undertaken herein, or any of the duties imposed upon it by this contract, such willful violation shall entitle the other party to terminate this contract, provided that the party desiring to terminate for such cause shall give the offending party at least thirty days written notice specifying the particulars wherein it is claimed that there has been a violation hereof; and if at the end of such time the party notified has not removed the cause of complaint, or remedied the purported violation, then the termination of this contract shall be deemed complete."

On June 23, 1921, appellee, by registered mail, through authority of its board of directors, addressed a communication to appellant, which communication was received on June 24, 1921, and in which it declared a forfeiture of each of the four contracts. The ground of forfeiture of the first three contracts was declared to be:

"That your company has failed and refused to use reasonable diligence in maintaining and operating its various distributing systems in an efficient manner and has failed and refused to prevent an unreasonable leakage, wastage and escape of gas in said distributing systems and that there has been a failure to keep said distributing plants in good operating condition; and, further, that your company has failed and refused to make payment to this company for gas sold and purchased within the time specified by said contracts."

The ground for forfeiture of the fourth contract was declared to be:

"First, that your company has failed and refused to construct or even commence the construction of distributing plants in the towns of Granbury, Itasca, Italy, Milford and West; second, that your company has failed and refused to construct an adequate distributing plant in the city of Waxahachie, and has failed and refused to make extensions of the distributing systems now constructed in order to encourage the use of natural gas and secure as large a sale thereof as is possible; third, that your company has failed and refused to make payment to this company for gas sold and purchased, within the time specified in said contract."

Upon receipt of this letter appellant at once filed its suit and obtained the issuance of the temporary writ of injunction.

Appellant alleged in its petition the execu-

tion in writing of the said four contracts, and alleged that thereby appellee had covenanted and agreed under the terms and conditions of said contracts to deliver to appellant, at points designated in each of the said contracts, such quantities of natural gas as the various distributing systems of appellant might require and for the term of years named in each contract. It also alleged, in effect, that it had faithfully performed all the covenants and agreements required of it by said contracts; that it had procured, from the governing bodies of the respective cities and towns named in the contracts, franchises authorizing it to construct, maintain, and operate in each of said cities and towns a natural gas-distributing system, and that, within the time stipulated in said contracts, it had purchased and installed in each of the said cities and towns adequate distributing systems and had fully complied with its duties and obligations in respect thereto; that, since the respective dates of said contracts, it had engaged in the sale and distribution of natural gas in said cities and towns as contemplated by said contracts; that, in order to carry out and perform its covenants in the contracts with appellee, it had invested $3,500,000 in property that was useful only for the distribution and sale of natural gas in the said respective cities and towns; that said property would be useless and of no value to appellant if appellee be permitted to discontinue the delivery of natural gas for sale and distribution to the respective consumers; that by a successful campaign of education, it had induced about 25,000 persons each to become a domestic consumer of natural gas; that appellant had become legally and morally obligated to each of the said domestic consumers and to the public generally in each of the said cities and towns to supply them with such quantities of natural gas as would meet the demand of these consumers for lighting, cooking, heating, and other purposes for which natural gas is customarily used; that approximately all of said 25,000 domestic consumers had become solely dependent upon the natural gas furnished by appellant under the terms and provisions of each of the said contracts for their supply of fuel, and will be so dependent thereon in the future; that the failure or inability of appellant to furnish gas to its said consumers, and each of them, and to other persons residing in said cities and towns, and their suburbs, as the same may be demanded, would subject appellant to a forfeiture of its said franchises and would deprive appellant of the only source of revenue to be derived by it from the property and equipment constituting its several distributing systems; that it had performed all the covenants and conditions incumbent upon it by the terms of said contracts, and was ready, able, and willing to continue to perform the covenants and conditions of same for the full term of years provided in each of said contracts.

It was further alleged that appellee had expressly repudiated each of said contracts and had declared same to be forfeited, null and void and of no further force or effect, and had so notified appellant and had declared its intention to discontinue the delivery of natural gas under each of said contracts. It further alleged that unless appellant, its agents, servants, and employés, were restrained therefrom by an order of the court, appellee would discontinue the delivery of natural gas to appellant at the several points of delivery enumerated in each of said contracts, and that appellant would thereby be caused to suffer a great and irreparable loss, for which it had no adequate remedy at law. It further alleged that appellee had a sufficient supply of gas available for distribution to appellant to supply the demand to the consuming public in each of its distributing plants, and that, by the exercise of reasonable diligence in the performance of appellee's covenants and obligations undertaken by it under each of the said contracts, it would continue to have such supply of gas throughout the life of each of said contracts.

Appellant's prayer for relief is as follows:

"Wherefore, plaintiff prays that the defendant be cited to appear and answer herein, and that upon final hearing hereof, the defendant, its agents, servants and employés, and each of them, be compelled by appropriate decree and process of the honorable court, to specifically perform the contracts herein sued upon, and each of them; and that pending the final determination of this cause, the defendant, its agents, servants and employés, and each of them, be enjoined from disconnecting its pipe line system from any of the distributing systems now owned and operated by plaintiff in the several cities and towns, as hereinbefore alleged, and that defendant, its agents, servants and employés, and each of them, be enjoined from closing any gates, or valves, or in any other manner obstructing or discontinuing the flow of natural gas from the wells through its said pipe line system into the several distributing systems now owned and operated by plaintiff in the respective cities and towns hereinabove enumerated, and that the defendant, its agents, servants, and employés, and each of them, be enjoined from doing, or causing to be done, any other act which would tend to, or have the effect of, obstructing or diminishing the flow of natural gas from its said pipe line system into the distributing systems now owned and operated by plaintiff in said cities and towns; and, in the alternative, plaintiff prays for a decree and appropriate process compelling such performance by the defendant as this court may deem meet and just, for all costs of this suit, and for such other and further relief, both general and special, as it may show itself entitled; and it will ever pray."

An analysis of the demurrers sustained by the court to appellant's petition discloses that the trial court held: (1) That appellant's petition did not show any equity that

will entitle it to relief, either in the form of an injunction restraining appellee from forfeiting the contracts, or for an affirmative decree enforcing the specific performance of the contracts; (2) that the relief of specific performance could not be granted, because it did not appear from said pleadings that appellee is able to furnish the natural gas from either of the two fields named in the various contracts; (3) that the relief of specific performance could not be granted on either of the contracts because each extends over a long period of time, involves the exercise of personal skill and scientific knowledge and ability, and the granting of such relief would call for and require the expenditure of large sums of money in the acquisition, construction, development, and operation of the large amount of gas property involved in the carrying out of these contracts; (4) that the relief of specific performance could not be granted because said contracts disclose on their face that they are wanting in mutuality to the extent that specific performance of same could not be enforced against appellant.

Another ground on which appellee insists, in its brief that a general demurrer should have been sustained to appellant's petition, is that the state Legislature by valid enactment abrogated all existing contracts in reference to the sale and delivery of natural gas by a producing company to a distributing company, and that by reason thereof the courts are without power to enforce specific performance of these contracts, and that the parties must be relegated to the Texas Railroad Commission for a settlement of all differences that may arise under these contracts.

Appellant challenges the correctness of the ruling of the trial court in respect to each of the grounds above mentioned, and has duly presented its contention by appropriate assignments of error.

[1, 2] The question for decision in this case is whether or not these contracts are such that a court of equity, in the exercise of its well-recognized powers, can decree their specific performance. It is true appellant seeks relief by injunction as well as by specific performance, but the former remedy is merely a negative decree of specific performance, and, as a general rule, the granting of an injunction is governed by the same principles, rules, and practice as apply to specific performance. The remedy of specific performance is purely an equitable one, and jurisdiction to grant such relief finds its basis in the inadequacy and incompleteness of any remedy at law. Specific performance is the actual accomplishment of a contract by the party bound to fulfill it, and a decree directing such specific performance is but a means of compelling the party to do that which he ought to have done without the coercive power of the court.

259 S.W.—44

When these contracts are analyzed, they are shown to be based on the valid consideration of the mutual promises and undertakings of both parties; they extend over a fixed and definite period of time; they call for the delivery on the one hand, and the acceptance on the other, of a quantity of natural gas sufficient to meet the demands of the consumers in a described territory; they provide a price to be paid for the gas that is determined in a fixed and definite manner, and they deal with a commodity that is both useful and convenient in serving the comfort and well-being of the public. In other words, these contracts create fixed and definite obligations between the parties that are both legal and binding, unless they were abrogated by the act of the Thirty-Fifth Legislature (Acts 1917, c. 30 [Vernon's Ann. Civ. St. Supp. 1918, arts. 732½ to 732½m, Vernon's Pen. Code Supp. 1918, art. 1522p]), commonly known as the Cox Pipe Line Bill. As to the effect of this legislation upon these contracts, we will discuss in another paragraph of this decision.

[3, 4] It is not, however, sufficient to warrant a court to enter a decree of specific performance on the showing alone of the existence of a contract binding in law. It must be shown also that the contract which forms the basis of such suit is not wanting in mutuality; that is, it must be such a contract in which each party stands on an equality in reference to the right to seek the relief of specific performance. Then, too, as in other kinds of equitable relief, the party seeking specific performance must show the inadequacy and incompleteness of any available remedy at law. In addition to all this, and under the very terms of the contracts, it was incumbent upon appellant to show that it was within the power and the ability of appellee to deliver the natural gas called for in the several contracts through the period of these contracts.

[5] In our opinion, all of these necessary elements are shown by the petition to exist. Appellant shows that at a large expenditure of money it prepared itself and is able to perform its contract obligations for the entire period of time of the life of these contracts, so that it has rendered itself subject to the same decree that it seeks to invoke against appellee. This case is such that, in the same decree in which the court directs the enforcement of the affirmative promises made by appellee in behalf of appellant, it can direct the enforcement of the affirmative promises made by appellant in behalf of appellee, and thus enforce all of the outstanding obligations of each contract at the time of the trial. This satisfies the broadest interpretation given the rule that there must exist mutuality in a contract, both of obligation and of remedy, before such contract

can be made the basis of a suit for specific performance.

[6] It also clearly appears from appellant's petition that there is not available any adequate remedy at law. It appears that the forfeiture of these contracts by appellee would result in a loss to appellant of the franchises held by it in the various cities and towns in which it operates, and that as a consequence its property, now of the value of $3,500,000, would become virtually worthless, and its business entirely destroyed. This is sufficient to show the absence of an adequate legal remedy.

[7] It is contended that these contracts are not now binding in law because, since their execution, the Thirty-Fifth Legislature enacted the Cox Pipe Line Bill; that this enactment vests, in the Railroad Commission of Texas, jurisdiction over all concerns owning and operating natural gas pipe lines in this state, and that the effect of this legislation is to abrogate these contracts, at least to the extent that the courts cannot enforce them. Section 3 of the act does vest in the Railroad Commission the power and the duty to establish a fair and equitable division of the proceeds of the sale of gas between the companies transporting or producing the gas, and the companies distributing or selling it; and it further declares that all orders and agreements of any company or corporation, or any person or persons, controlling such pipe lines, establishing or prescribing prices, rates, rules, and regulations and conditions of service, shall be subject to review, revision, and regulation by the Railroad Commission.

An examination of this act discloses that it was the public interest, affected by those who produced, transported, and marketed natural gas, that induced the Legislature to enter this field and make the producers and handlers of this commodity the subject of legislative control. Indeed, it may be said that it is only because of this public interest that the Legislature could enter such a field and enact such legislation. For the public weal, it has given the Railroad Commission power, under certain prescribed procedure, to review and revise rates fixed by municipalities for the payment to distributing companies for gas used by the consumers residing in such municipalities. Such commission, as stated above, also has the power "to establish a fair and equitable division of the proceeds of the sale of gas between the companies transporting or producing the gas, and the companies distributing or selling it." This latter power is intended to be exercised by the commission only when necessary to do so in order that it may be able to do justice, both to the consuming public and the distributing company, in the matter of fixing rates between such consumer and distributor of gas. It is not believed that this act gives to the Railroad Commission power of revision over a pre-existing contract between a producing and distributing company independent of any issue or question of the making, or revision of such rates. In this suit there is no issue as to rates charged the public, and no issue of the adequacy of service to the public involved; in fact, there is nothing in our opinion that gives to the Railroad Commission jurisdiction of any question at issue in this case. It does not follow that, because some time in the future the contracts under which appellant and appellee are now operating may yield to revision because of the exigencies of public interest, appellee may ignore its binding obligations, destroy the property of appellant invested on faith in the integrity of appellee's promises, and remit appellant to the Railroad Commission for relief. On the contrary, we believe appellee should perform its contract obligations until relieved therefrom on a proper showing that public interest demands such a course. City of Monroe v. Detroit M. & T. S. L. Ry., 187 Mich. 364, 153 N. W. 669; City of Saginaw v. Consumers' Power Co., 213 Mich. 460, 182 N. W. 147–154.

[8, 9] It is urged that a court of equity will not decree specific performance of these contracts, because they show on their face that they extend over a long period of years and would involve the court in long and laborious supervision, and also would call for the exercise of personal skill and scientific knowledge and require the expenditure of large sums of money in the acquisition, construction, development, and operation of gas plants consisting of more or less complex machinery.

The rule contended for by appellee is a rule of decision and not a limitation of the jurisdiction of a court of equity, and, being only a rule of decision, its application to this case could not be determined by demurrer. Texas Farm Bureau Ass'n v. Stovall (Tex. Sup.) 253 S. W. 1101–1108. However, we will not rest this opinion upon the mere holding that the sustaining of the demurrer was error, for this might give rise to a wrong inference. It is by no means every contract that would require long and continuous supervision, of which a court of equity will deny specific performance. This rule, rigidly enforced in England when equity was forming, has been greatly relaxed in this country in recent decisions. The idea of the dignity and leisure of a court of equity which once obtained is out of place in a system of government in which service to the public rather than personal comfort is the real test of the dignity of the courts. Courts of equity now consider more the results that might follow a denial of a decree for specific performance than the time and labor required of the court to enforce such specific performance.

They look more to the nature of the impending wrong and the extent and character of its consequences, than to the time consumed and the labor endured in avoiding these consequences. When these contracts were executed the parties stood on equality. There was nothing that would tend to coerce either to agree to a contract that its judgment might disclose was inequitable. If appellee is given security in its right of forfeiture, appellant is at once faced with dire consequences. It must have appellee's gas, or its large investments are destroyed. It would be compelled almost, at the behest of appellee, to make the character of contract demanded. The equality on which they met when the contracts were executed has now no existence. Under such a condition a court of equity would not be warranted in denying a decree of specific performance on the rule above stated. Again, this rule of decision contended for by appellee finds no place in a case that touches the public interest as does the subject-matter of these contracts.

Mr. Elliott, in his work on Contracts (volume 3, § 2322), in discussing this rule, says:

"It will not operate to prevent specific performance where public interest seems to require it."

25 R. C. L. at page 227, announces a similar doctrine as follows:

"Difficulties in regard to supervision will not be allowed to deter a court of equity from granting specific performance of a contract where public interests seem to require it."

The following decisions are based upon a recognition of the doctrine as above announced: Bounds v. Hubbard City, 47 Tex. Civ. App. 233, 105 S. W. 56; Joy v. St. Louis, 138 U. S. 1, 11 Sup. Ct. 243, 34 L. Ed. 843; Prospect Park & C. I. R. Co. v. Ry. Co., 144 N. Y. 152, 39 N. E. 17, 26 L. R. A. 610.

That these contracts are of vital interest to the public cannot be questioned. Indeed, when the parties executed them, they recognized this fact, and appellant, who was to deal directly with the public, was required to carry on a campaign of education and to secure as many of the residents, in the territory covered by the contracts, as could be persuaded by such means, to place themselves in such a position as would make them dependent on the performance of these contracts for their fuel, one of the greatest necessities of life. If either of the parties be permitted to repudiate its contract obligations, great inconvenience and much expense would result to the large number of consumers induced to place themselves in such position on their faith in the contractual integrity of the parties. We therefore hold that the court erred in sustaining the demurrer specifically setting up this defensive matter, and also hold that, because of the great public interest involved,

the rule invoked in behalf of this demurrer has no application to this case.

[10] Appellee bases its ground of forfeiture on contractual rights reserved by each party in the contracts. Appellee declared a forfeiture of these contracts because of the asserted violation by appellant of certain stipulations in the contracts which gave to it such right. Appellant, in its verified petition, has denied that it violated any of these stipulations. The issue thus joined, of course, was not determined by the action of the court in sustaining the demurrers. In fact, in passing upon the demurrers, the trial court must assume that there were no such violations on the part of appellant. However, as this case must be tried on its merits, and for the guidance of the court below, we hold that a court of equity would not be warranted in denying a decree of specific performance on the ground that either party had violated a stipulation in the contract that gave to the other party the contract right of forfeiture. This necessarily follows because of the great interest that the public has in each party performing its obligations in these contracts. When the parties placed the forfeiture stipulations in these contracts, they were charged with the knowledge that necessarily the public interest would demand the faithful performance of the contracts, and that such a right could not be asserted as against this public interest. We therefore hold that, if appellee has suffered damages by reason of any failure of appellant to perform any of the stipulations of this contract, appellee should be remitted to its suit for damages rather than be allowed to exercise its right of forfeiture.

[11] Did the trial court err in holding on demurrer that interveners were not proper parties to this suit? Before a party can intervene in a pending suit, either in law or equity, he must not only show that he is interested in the subject-matter of the suit, but must also show that this interest is of such a nature, and that he occupies such relation to the subject-matter of the suit, as would warrant the court in entering a decree in his behalf. Pool v. Sanford, 52 Tex. 621; Graves v. Hall, 27 Tex. 148; Smalley v. Taylor, 33 Tex. 668; Fleming v. Seligson, 57 Tex. 524; Building Ass'n v. King, 71 Tex. 729, 12 S. W. 65.

[12] That the interveners are interested in the subject-matter of this suit, there can be no question. This interest fully appears from the allegations in their respective pleas of intervention. So, the question is, do their allegations show that they stand in such relation to the subject-matter of this suit as entitles them to a judgment granting the affirmative relief for which they pray? The only relief for which they pray, and which a court could grant, is a judgment awarding them the decree of specific performance of the contracts between appellee and appellant, or

the negative decree of injunction against the breach of the contracts by either of the parties. As stated above, this relief cannot be granted unless interveners are in such privity to these contracts as that they have such binding effect on them as would permit the entering of a similar decree against them. It affirmatively appears from their several pleas of intervention that they stand in no such relation to these contracts. We therefore hold that the court did not err in dismissing the several pleas of intervention. Hutchinson Gas & Fuel Co. v. Wichita Natural Gas Co. (C. C. A.) 267 Fed. 35; City of Winfield v. Wichita Natural Gas Co. (C. C. A.) 267 Fed. 47.

As between appellant and appellee, the case will be reversed and remanded with instruction to the trial court to reinstate the temporary writ of injunction theretofore granted, and to try the case on its merits consistent with this opinion. The case as between appellee and interveners is affirmed.

Reversed and remanded with instructions as to plaintiff in the court below, and affirmed as to interveners in the court below.

### On Motion for Rehearing.

The holding of this court, in the original opinion, to the effect that that clause in each of the contracts which gives the right of forfeiture as a remedy in case of the breach of the terms of the contract should not be enforced, has been vigorously assailed in motion for rehearing. That holding was based upon the theory that such clause was invalid, and to this holding we adhere, but will state more fully the principles of law upon which such holding is based.

[13, 14] It may be stated as elementary that the parties to a contract may agree and contract with reference to the remedy to be invoked in case of a breach of its terms and conditions by either party, provided the remedy thus made available against the offending party does not contravene the law of the land or violate the public policy of the state. It may further be stated as elementary that, when parties have legally contracted in reference to a mutual remedy for breach of the contract, such remedy then becomes a vested property right in each of the parties, to be protected by the courts with as much zealous care as any other vested property right. These principles apply to contracts between public service corporations as well as to contracts between private corporations and individuals; and they also apply equally to contracts whose subject-matter deals with the administration of a public utility as they do to those contracts whose subject-matter is not impressed with a public interest.

The test to be applied in each instance is the same, and, is: Does the contract remedy contravene either the law or public policy? If it does not, it is valid, and the courts cannot deprive the parties to the contract of its benefits; if it does, it is invalid, and the courts cannot permit the parties the use of its benefits.

[15] While the rule stated for determining whether a contract remedy is valid is the same with all classes of persons, corporations, and all character of contracts, still public service corporations and contracts whose subject-matter affects the public interest are much more limited in the freedom to contract in this respect. This follows because of the duty to the public, a duty that is paramount to private interest.

It is not necessary to discuss all of the limitations in this respect. It is sufficient for this case to state that public service corporations cannot contract, so as to endanger, cause to be suspended, or to be rendered impossible, the performance of duty to the public. The following statements of this rule are deemed sufficient:

In the case of Gibbs v. Consolidated Gas Co. of Baltimore, 130 U. S. 396, 9 Sup. Ct. 553, 32 L. Ed. 979. Chief Justice Fuller, in delivering the opinion of the court in reference to this rule, says:

"It is also too well settled to admit of doubt that a corporation cannot disable itself by contract from performing the public duties which it has undertaken, and by agreement compel itself to make public accommodation or convenience subservient to its private interests."

13 Corpus Juris, p. 444, after laying down the general rule in reference to public service corporations as announced by Chief Justice Fuller, says:

" * * * So agreements by railroad companies and other common carriers, water and gas companies, and other quasi public corporations owing duties to the public, which interfere with the performance of such duties, are illegal and void as being contrary to public policy, the question not depending on whether the public has in the particular case suffered any detriment, but on whether the contract is in its nature such as might be injurious to the public."

The Supreme Court of this state, in the case of Railway Co. v. Morris et al., 67 Tex. 692, 4 S. W. 156, announces the same rule in the following language:

"It is well settled that corporations organized for public purposes cannot, by contract of sale, lease or otherwise, render themselves incapable of performing their duties to the public, or in any way absolve themselves from the obligation which forms the main consideration for giving them a corporate existence, unless this be done by consent of the state, given through the charter, or in some other manner."

This same principle is again affirmed by our Supreme Court in the case of Raywood Rice, Canal & Milling Co. v. Erp & Ripe, 105 Tex. 167, 146 S. W. 155.

These quotations and citations of authority might be extended to an indefinite length, but the above are sufficient to show the rule and to show also its universal application.

Is the tendency of this said forfeiture clause such as to prevent or disable either party to the contracts from performing its duties to the public? The service to the public is accomplished directly through and by means of the delivery of natural gas by appellee to appellant at the various places named in the contracts. The assurance to the public that this delivery will be made, and that service to the public will be performed, rests in the carrying out by both parties of these contracts. Permit either party to declare these contracts at an end, and this assurance is at once removed. The very purpose for which these corporations were created and are allowed to exist was in the instant case made certain of accomplishment by the execution of these contracts. To say that they can contract between themselves for their own private interests to bring these contracts to an end, and thereby destroy the security of service to the public, is to announce a rule that public accommodation and public convenience may be made subservient to the private rights and interests of those who voluntarily took upon themselves the performance of a great public service. This the courts cannot permit.

The respective motions for rehearing are overruled.