Argued July 7; reversed October 18; rehearing denied
November 22, 1938

# PUBLIC MARKET CO. *v.* CITY OF PORTLAND

(83 P. (2d) 440)

*Charles A. Hart* and *Prescott W. Cookingham*, both of Portland (Carey, Hart, Spencer & McCulloch, Cookingham & Hanley, and Glen McCarty, all of Portland, on the brief), for appellant.

*L. E. Latourette*, City Attorney, and *Alexander Brown*, of Portland (Frank S. Grant, City Attorney, of Portland, on the brief), for City of Portland.

*George R. Wilbur*, of Portland, and *Robert C. Goodale*, of New York City (James B. Alley, of New York City, and Max O'Rell Truitt, of St. Louis, Mo., on the brief), for respondent Reconstruction Finance Corporation.

RAND, J. The plaintiff, Public Market Company, instituted this suit on the equity side of the court against the City of Portland, praying for specific performance of a contract and for an accounting. The city demurred to the complaint upon two grounds: (1) that the complaint failed to state facts sufficient to constitute a cause of suit, and (2) that the court had no jurisdiction of the subject of the suit for the reason that the plaintiff had a complete and adequate remedy at law. The circuit court sustained the demurrer and, upon plaintiff's refusal to plead further, dismissed the suit and provided in the decree that the suit was dis-

missed with prejudice against the bringing of another suit by the plaintiff for the same cause or any part thereof. From this decree, the plaintiff has appealed.

It appears from the allegations of the complaint and from a copy of the contract, which is attached to the complaint as an exhibit, that on October 28, 1931, the plaintiff entered into a contract with the City of Portland wherein the plaintiff undertook and agreed to construct for the city a public market building, which was to be owned and maintained by the city as a public utility. The contract provided that the same should be constructed in part on certain designated blocks and lots in the city belonging to the plaintiff and in part on streets adjoining the same, which the city had vacated for that purpose.

It was also stipulated and agreed that the building should be constructed in accordance with certain plans and specifications which were to be furnished by the city and that these plans and specifications were subject to change at any time by the city. The contract also provided that the plaintiff was to furnish the market building with such materials and supplies as should be designated by the city council and should be opened for business by the plaintiff. It was further provided in the contract that, upon completion of the building and the equipment thereof, the plaintiff would convey to the city by a warranty deed a marketable title to the premises, together with the building and improvements thereon, and furnish bills of sale for the materials and supplies therein, and furnish an abstract of title to the property, in consideration of which the city expressly promised to pay to the plaintiff at the time the deed and bills of sale were tendered for the said building and premises the sum of $1,244,790.66, and that it would also pay to the plaintiff the actual

cost plus 10 per cent of the materials and supplies so furnished.

The undertaking of the city to pay plaintiff for its performance of said contract is stated in these words:

"Upon the completion by the Company of its obligations under this agreement, and at the time of the tender by the Company to the City of proper conveyances of said property and assignments of its leases, contracts and insurance policies affecting said premises, the City shall accept said conveyances and said assignments and shall pay to the Company the sum of $1,244,790.66; and as of the date of said conveyances and assignments and of the making of said payment by the City to the Company, there shall be an accounting between the City and the Company, and the Company shall pay to the City all prepayments of rent and pro rata shares of premiums and deposits based upon the unexpired portion of existing leases and all repayments of other moneys under existing contracts which shall represent unearned income of the Company, and the City shall pay to the Company all prepaid expenses which the Company has at that time advanced under the terms of its existing contracts. In addition to the principal sum of $1,244,790.66 hereinabove mentioned, and at the time provided for the payment of said sum, the City shall also reimburse the Company in the full amount of the cash advanced and/or liability incurred by the Company in the purchase of the equipment, materials and supplies described in Exhibit 'B', and shall pay to the Company, in addition thereto, ten per cent (10%) of the purchase price of said equipment, materials and supplies to cover the services of the Company in making said purchases. Such purchases of materials, equipment and supplies shall be subject to the approval of the Council in all respects, including the price paid therefor. All payments due from the City to the Company hereunder, if unpaid to the Company when due, shall thereafter bear interest at the rate of six per cent (6%) per annum, payable quarter-annually."

The complaint alleges that the plaintiff fully performed the contract upon its part and all the terms and conditions thereof and tendered a deed for the premises and building to the city and did all other acts required by the contract to be performed by it and that the city, without assigning any reason therefor, refused to accept said deed and has ever since failed and refused to perform the contract or any of the terms and conditions thereof.

It is also alleged in the complaint that, in order to obtain the funds necessary for the construction of the building, the plaintiff, with the express consent of the city, borrowed from the Reconstruction Finance Corporation the sum of $775,000 and evidenced said indebtedness by issuing and delivering to said corporation bonds for that amount and secured the payment thereof by the execution of a mortgage upon said building and premises, and that the First National Bank of Portland is now the trustee under said mortgage for the Reconstruction Finance Corporation, the holder of the bonds. For that reason, they having declined to become plaintiffs in the suit, they were joined as defendants.

There are numerous other allegations contained in the complaint which, so far as deemed material, will be hereinafter referred to.

■■ For reasons which will now be stated, we think that the demurrer should have been overruled and that the city should have been compelled to answer and set up its defense, if any exists, to the complaint. The contract, as stated, expressly provides that, upon complete performance of the contract by the plaintiff, an accounting shall be had between the plaintiff and the city. The complaint shows that there are various sums of money in the hands of the plaintiff for which it must account to the city and that other sums of money had been paid

out by the plaintiff for which the city must account to the plaintiff upon plaintiff's transfer of the property to the city. It is an established principle of law that a contract must be performed in its entirety if performed at all under compulsion of a court of equity, and, since the contract provides for an accounting and the necessity exists therefor, that provision of the contract should be enforced.

In passing upon this demurrer, it must be borne in mind that the subject matter of this contract is land and the relief sought is the specific performance of a contract for the sale of land. The controversy, therefore, was in respect to a matter over which a court of equity has exclusive jurisdiction and, for that reason, there could be no accounting in a law action. That a court of equity has jurisdiction to enforce specific performance of this contract is elementary.

"* * * Where land, or any estate therein, is the subject-matter of the agreement, the equitable jurisdiction is firmly established. Whenever a contract concerning real property is in its nature and incidents entirely unobjectionable—that is, when it possesses none of those features which, as we shall see, appeal to the discretion of the court, it is as much a matter of course for a court of equity to decree a specific performance of it, as it is for a court of law to give damages for the breach of it."

Pomeroy's Specific Performance of Contracts, 3 Ed., sec. 10.

In *Larrabee v. Bjorkman*, 79 Or. 467 (155 P. 974), this court said:

"Where land or any estate or interest in land is the subject matter of the agreement, the jurisdiction to enforce specific performance is undisputed, and does not depend upon the inadequacy of the legal remedy in the particular case. It is as much a matter of course

for courts of equity to decree a specific performance of a contract for the conveyance of real estate which is in its nature unobjectionable as it is for courts of law to give damages for its breach. Equity adopts this principle, not because the land is fertile, or rich in minerals, but because it is land, a favorite and favored subject in England and every country of Anglo-Saxon origin. Land is assumed to have a peculiar value, so as to give an equity for specific performance, without reference to its quality or quantity."

The above was quoted with approval in *Spencer v. Bales*, 108 Or. 339 (216 P. 746). Again, in *Slattery v. Gross*, 96 Or. 554 (187 P. 300, 190 P. 577), this court, after stating that it is assumed in every instance that damages are an inadequate relief for the breach of a land contract, said:

"It is well settled that either party to a contract for the purchase of real property, may maintain a suit for specific performance—the vendee to recover the land and the vendor to recover the purchase price. The reason why the vendee may maintain a suit in equity for specific performance against the vendor—as announced by all the courts—is that the damages which he could recover in an action at law, are inadequate recompense for the loss of the real estate which he has contracted to purchase, and which may have—and is assumed to have—a peculiar value to the purchaser, which money damages will not replace."

■ The contention that the plaintiff has a complete and adequate remedy at law, even if true, would not oust the court of its equitable jurisdiction in this case, for the reason that the case is one which comes within the exclusive jurisdiction and not the concurrent jurisdiction of a court of equity. It is only in cases where a court of equity has concurrent jurisdiction with courts of law that an adequate legal remedy will deprive the court of its equitable jurisdiction. The distinction be-

tween the two classes of cases is plain. Where a court of equity has concurrent jurisdiction with courts of law, equity loses its jurisdiction if the plaintiff has a complete and adequate remedy at law, while in those cases coming within the exclusive jurisdiction of a court of equity the adequacy or inadequacy of the legal remedy is of no importance for the court retains its equitable jurisdiction regardless of that fact. This distinction was pointed out by the author, in 1 Pomeroy's Equity Jurisprudence (3d Ed.), section 139, in a footnote, as follows:

"There is a distinction here of great importance, but which has often been overlooked. The want of a full, adequate, and complete remedy at law, under the circumstances of the particular case, is also the reason why the jurisdiction of equity is actually exercised, and a decision is made in favor of the plaintiff granting him equitable relief, in some instances of the exclusive jurisdiction; as, for example, in suits for the specific performance of contracts. But such fact is not in these instances the foundation of the jurisdiction; it is only the occasion on which a decision is rightfully made in pursuance of the doctrines of equity jurisprudence by courts already possessing the jurisdiction. The jurisdiction exists because courts of equity alone are competent to administer these remedies. In all instances of concurrent jurisdiction, both the courts of law and those of equity are competent to administer the same remedy, and the foundation of the jurisdiction in equity is the inadequacy of the relief as it is administered through means of the legal procedure. The exclusive jurisdiction of equity rests upon an entirely different foundation, and exists absolutely without reference to the adequacy of legal reliefs. This distinction is a plain one, but is often lost sight of; * * *".

■ Under the charter of the city of Portland (section 151), the council is authorized to construct, purchase,

condemn or otherwise acquire a public market and to own and operate the same as a public utility. When so owned and operated by the city, it is, under section 153 thereof, a public utility within the meaning of that term as used in the charter. By section 155 thereof, the council is authorized, in acquiring a public utility, to issue and sell public market utility certificates which are to be secured by a mortgage on the property so acquired and the revenues thereof, and, when so acquired, the indebtedness evidenced by said certificates and mortgage does not become a general obligation against the city but is payable solely from the revenues derived therefrom, or from the sale of the plant. In order to exercise the power thus conferred by said section, the city must first acquire title to the property, then place a mortgage thereon, after which it is authorized to issue and sell public market utility certificates. There is nothing, however, in that section, or in any other section of the charter, which prohibits the council from acquiring title to a public utility in a different manner than that prescribed by section 155, except that contained in the section next referred to.

Section 160 of the charter provides:

"No indebtedness shall be incurred for the acquisition of any public utility under the provisions of this Charter which, together with the existing bonded indebtedness of the city, shall exceed at any one time seven per centum of the assessed value of all real and personal property in the city."

It is clear from this provision of the charter that, where the indebtedness of the city does not exceed the amount so limited, the council is authorized to purchase a public utility without issuing any public market utility certificates and thereby to create a general obligation upon the part of the city and one payable

from the general fund. There is no allegation in the complaint and nothing in the record before us which shows or tends to show that, at the time this contract was entered into, the indebtedness thereby incurred, together with the existing bonded indebtedness of the city, exceeded the limitation contained in section 160.

■■ Courts do not take judicial notice of the indebtedness of a city and, hence, if the indebtedness created by this contract exceeded the limitation contained in section 160, it was a matter which could not be raised on demurrer to the complaint but was a defense which the city could only set up by way of an answer. The trial court, however, as appears from a written opinion filed in the court below, held that, because of certain provisions contained in two ordinances of the city to which we will later refer, the council, in entering into this contract, was acting under section 155 of the charter and not under section 160, and, upon that assumption and so holding, denied specific performance of this contract for reasons stated in the opinion as follows:

"* * * It seems to be well established that a court of equity will not undertake to enforce specific performance of a contract, when to do so would necessitate the supervision by the Court of a protracted series of acts upon the part of the defendant, and although this rule is said to be one of decision and not a limitation of the Court's jurisdiction, and is subject to some few exceptions, the Court has found no authority holding that in an attempt to enforce specific performance a court may undertake to supervise or direct how acts involving or requiring the exercise of discretion shall be performed."

■■ Even if true, as held by the trial court, that the obligation created by this contract was not a general obligation of the city but was to be paid from a special

fund derived from the sale of public market utility certificates, yet we think that the plaintiff was entitled to have the contract enforced. In that case, the court would not be called upon to exercise any discretionary or legislative powers of the city and, although the duties devolving upon the court might be very arduous, the injustice done to the plaintiff by denial of all equitable relief was so great that no amount of work upon the part of the court, we think, would warrant or justify such denial. The better rule and the one which we think the court should have followed, even if the view taken by the court was correct, is stated by the court in *Municipal Gas Co. v. Lone Star Gas Co.* (Tex Civ. App.) 259 S. W. 684, as follows:

"* * * It is by no means every contract that would require long and continuous supervision, of which a court of equity will deny specific performance. This rule, rigidly enforced in England when equity was forming, has been greatly relaxed in this country in recent decisions. The idea of the dignity and leisure of a court of equity which once obtained is out of place in a system of government in which service to the public rather than personal comfort is the real test of the dignity of the courts. Courts of equity now consider more the results that might follow a denial of a decree for specific performance than the time and labor required of the court to enforce such specific performance. They look more to the nature of the impending wrong and the extent and character of its consequences than to the time consumed and the labor endured in avoiding these consequences * * * this rule of decision contended for by appellee finds no place in a case that touches the public interest as does the subject-matter of these contracts."

The two ordinances above referred to, upon which the trial court relied, are numbered respectively 61192 and 61566. The first was passed by the council on

August 5, 1931, and the other on October 10, 1931. In the first ordinance, the council declared that:

"It is the purpose and intention of this ordinance that the City of Portland, Oregon, shall obligate itself to establish a public market in the City of Portland, Oregon, as a public utility and to purchase land and buildings and equipment therefor."

That ordinance also provided that, to procure the necessary funds therefor, public market utility certificates, not exceeding the sum of $2,500,000, shall be issued and sold by the city. It prescribed the form of such certificates and how they should be issued and sold. It also declared that the certificates should be secured by a trust mortgage on the premises and buildings purchased and that these certificates were to be paid exclusively from the revenues derived from the operation of the market by the city. Under this ordinance, it is clear that the purchase money was to be obtained by the issuance and sale of public market utility certificates. This was in strict conformity with the provisions of section 153 of the charter, and if no later ordinance had been enacted, it could have been raised in no other manner.

The contract sought to be enforced states that it was executed by the mayor and attested by the auditor "pursuant to authority duly given under the terms of Ordinance No. 61566 of the City of Portland, enacted on the 10th day of October, 1931, and effective on the 10th day of October, 1931, and Resolution No. 20291, adopted October 28, 1931". The resolution of the council authorizing the execution of the contract reads as follows:

"Resolved by the Council that the hereunto attached form of contract prepared by the City Attorney is hereby approved as to form and contents by the Coun-

cil. Adopted by the Council, Oct. 28, 1931. GEO. R. FUNK, Auditor of the City of Portland, By L. E. Burdick, Deputy.''

Section 2 of the ordinance last referred to provides as follows:

''The Mayor and Auditor are hereby authorized to execute on behalf of the City a contract with the Public Market Company of Portland, an Oregon corporation, for the purchase of the above described real property and a building to be erected thereon and equipped by said Public Market Company of Portland in conformity with the plans and specifications now on file with the Auditor, subject, however, to such changes as may be determined upon by the City. Provided, however, that the form of said contract shall be prepared by the City Attorney and said contract shall be approved as to form and contents by the Council by resolution prior to its execution by the Mayor and Auditor.''

Under the authority conferred by that section, the city attorney was authorized to prepare a contract and, when the same had been approved by the council by resolution, the mayor and auditor were authorized to execute it for and on behalf of the city. The contract was prepared and it was approved by the council and executed by the proper officers in accordance with the provisions of the ordinance and under the authority thereby given. However, in the ordinance last passed reference was made to the first ordinance above referred to and reference is also made to the first ordinance in the contract itself. The references contained in the ordinance last passed are as follows:

In its title it recites that it is an ordinance designating certain real property to be purchased for use as a public market and the construction of a building ''upon the terms and conditions required by Ordinance No. 61192, passed August 5, 1931, and upon such other

terms and conditions as shall hereafter be determined by the Council, and authorizing preparation, approval and execution of a contract with the Public Market Company of Portland, and declaring an emergency.'' And, in the body of the ordinance, it states that:

"Conforming to the provisions of Ordinance No. 61192 * * * passed by the Council August 5, 1931, the hereinafter described real property (referring to the property involved here) is hereby selected and designated for use as a public market and the purchase of said real property and a building to be constructed thereon and equipment to be installed in said building is hereby authorized from the Public Market Company of Portland, an Oregon corporation, owner thereof, upon the terms and conditions required by said Ordinance No. 61192, and subject to the terms of the contract hereinafter referred to.''

The contract also refers to the first ordinance in these words:

"The Company agrees that within fifteen (15) days after the City shall have procured the approving opinion of legal counsel of the authority of the city to issue and sell the public market utility certificates authorized by Ordinance No. 61192, it will resume active construction of a public market building upon the real property in the City of Portland hereinafter more particularly described * * *''.

In enacting the last ordinance, pursuant to which this contract was entered into, the council had authority to adopt, modify or repeal any or all the provisions of the former ordinance and, under its provisions, it authorized the preparation and execution of this contract after the same had received the approval of the council. The only limitations upon the power of the council to authorize the making of this contract, so far as the record shows, are those contained in section 160 of the

city charter, and there is nothing in the record to show that such limitation was exceeded by the making of this contract. Having provided, as the last ordinance did, that the purchase was to be made "upon the terms and conditions required by said Ordinance No. 61192, and subject to the terms of the contract hereinafter referred to", and the title stating that the purchase was to be made upon the terms and conditions required by that ordinance "and upon such other terms and conditions as shall hereafter be determined by the Council", the question is: What did the council mean when it authorized the contract to be executed "upon such other terms and conditions as shall hereafter be determined by the Council"?

One of the definitions of the word "other" as given in Webster's International Dictionary, is "not the same; different". Presumably, the word "other" was used in that sense by the council. In any event, the council was best qualified to determine what meaning it intended to give to the contradictory terms above referred to, and also to determine what particular provisions of the first ordinance were referred to in the ordinance last passed, and its intention is best expressed by what it did and caused to be done in authorizing the execution of this contract. It is not supposable that the city attorney would draw a contract or that the council would adopt it if it was in direct violation of the provisions of the ordinance under which it was executed. Consequently, we must look to the particular provisions contained in the contract to determine to what extent the council was to act under the terms and conditions of the former ordinance and to what extent it intended to act upon such other terms and conditions "as shall hereafter be determined by the council", and, as stated, the best evidence of that

intention is the action subsequently taken by the council in carrying out that intention.

The contract, as stated, expressly promised to pay plaintiff the principal sum mentioned in the contract at the time proper conveyances were tendered to the city and this would be impossible if the city had to first acquire title, then mortgage the property and subsequently issue and sell public market utility certificates and, from the fund realized therefrom, pay over the sums promised. The council having put that construction upon the authority conferred by the last ordinance and having acted upon it, we think, it is conclusive upon the question of what construction should be placed upon the ambiguous terms before referred to, for clearly it cannot be assumed that the council or the city attorney intended or believed that they were violating any of the terms of the ordinance under which they were acting when they entered into this contract. The only provision contained in the contract providing that any of the payments to be made to the plaintiff shall be from funds derived from the sale of public utility certificates is the following:

"* * * The Company agrees that it will pay all legal taxes, assessments and interest which become due and are payable after November 5, 1931, up to the time that it delivers title to the City, and the City agrees that it will reimburse said Company from funds derived from the sale of Public Market Utility Certificates for all sums which said Company shall pay for such taxes, assessments and interest, with interest at six per cent from the date of said payment or payments."

If it had been the intention of the council that payment of the principal sum of $1,244,790.66 was to be paid only from funds derived from the issuance and sale of public market utility certificates, it is reason-

able to suppose that the city would have included, as to that payment, the same provision as the one relating to the payment of taxes and not have expressly contracted that the payment should be made at the time the deed was tendered and accepted by the city. This conclusion is strengthened by the fact that the plaintiff, while performing the contract, borrowed from the Reconstruction Finance Corporation the sum of $775,000 and placed a mortgage on said property for that amount. That the city authorized the plaintiff to borrow said sum and to give said mortgage clearly appears from two resolutions duly adopted by the council, numbered respectively 20557 and 20649, copies of both of which are attached as exhibits to the complaint. The first was adopted on October 6, 1932, and the last on April 13, 1933. In the first resolution, it is recited that:

"Whereas, in order to give the Reconstruction Finance Corporation a first mortgage lien upon the property described in the contract, it is necessary that the city of Portland subordinate its rights under the contract of purchase to the rights of the Reconstruction Finance Corporation as first mortgagee, and to recognize the mortgage of the Reconstruction Finance Corporation as a first, prior, and existing lien upon all of the property described in the contract, superior to any rights of the City under and by virtue of the terms of the contract hereinabove referred to; now therefore,

"Be It Further Resolved by the Council, that to induce the Reconstruction Finance Corporation to make said loan, the City of Portland, by and through its Council, does hereby declare to the Reconstruction Finance Corporation that the contract of date October 28, 1931, executed by and between the Public Market Company of Portland, an Oregon corporation, as first party, and The City of Portland, a municipal corporation of Oregon, as second party, wherein and whereby the City of Portland agreed to purchase, and the Public Market Company of Portland agreed to sell certain land

and buildings thereon, all as set forth in the above described contract, which contract is Contract No. 3214, filed with the Auditor of the City of Portland October 28, 1931, shall be and the same is hereby made subject and subordinate in each and every respect to the lien of the mortgage to be placed upon said real property by the Reconstruction Finance Corporation in a sum not to exceed Eight Hundred Thousand Dollars ($800,000.00), and hereby consents that the mortgage of the Reconstruction Finance Corporation from the Public Market Company of Portland shall be and is a first, prior and superior lien to that of the contract of purchase above referred to, held by the City of Portland.''

■ The second resolution fixes the amount of the mortgage which may be given in the sum of $775,000 and corrects an error in the description contained in the first resolution of the real property which was to be covered by the mortgage and reiterates what was contained in the first resolution to the effect that the rights of the city are to be subordinate to the rights of the mortgagee. By consenting to the execution of this mortgage upon the property contracted for, the city put it out of its power, if it ever had such power, to issue and sell the public market utility certificates and secure the same by mortgage upon the property which it had contracted to purchase until after the mortgage given to the Reconstruction Finance Corporation had been satisfied and discharged. This fact alone, we think, conclusively establishes that the city, when authorizing the giving of this mortgage and when entering into the contract with the plaintiff, did not intend that the payment of the principal sum was to be made in any other manner than from its general fund.

■ The city contends that, because this mortgage was unsatisfied at the time the deed was tendered, it was beyond the power of the plaintiff to convey to the city

a good and merchantable title or one free from all liens and incumbrances. In view of what has been said, this contention is wholly without merit. The incumbrance was placed upon the property with the express consent of the city. Moreover, an incumbrance existing on the land will not prevent specific performance in a suit by the vendor provided the incumbrance is not in excess of the purchase price to be paid. In such case, the purchase money may, by order of the court, be applied in discharge of the mortgage debt: *Sanford v. Wheelan*, 12 Or. 301 (7 P. 324) ; *Farmers Tobacco Warehouse Co. v. Eastern Carolina Warehouse Corporation*, 185 N. C. 518 (117 S. E. 625) ; Pomeroy, Specific Performance, 3 ed., sec. 342.

It is true, as Mr. Justice BAILEY points out, that section 9-215, Oregon Code 1930, provides that: "the intention of the parties, is to be pursued, if possible", but that section also provides that: "when a general and particular provision are inconsistent, the latter is paramount to the former. So a particular intent shall control a general one that is inconsistent with it."

Under the contract, as stated above, it is expressly provided that, at the time the deed and other conveyances are tendered and accepted by the city, the city shall pay to the plaintiff the sum of $1,244,790.66. There is no provision in the contract which modifies that express promise to make said payment at said time. Hence, by force of the statute, if it could be held that this particular provision is inconsistent with some general provision of the contract, the particular provision, and not the general provision, is paramount and controlling, both as to the time of payment and the amount to be paid. The dissenting opinion of Mr. Justice BAILEY practically ignores the express promise contained in the contract to make said payment at said time and

gives to the contract a meaning that would be proper if that provision had not been inserted in the contract. This construction is directly contrary to the requirements of section 9-214, Oregon Code 1930, which he cites and which provides that:

"In the construction of a statute or instrument, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such construction, if possible, is to be adopted as will give effect to all."

If adhered to, this construction would result in the omission of the express promise which the parties inserted in the contract to make said payment at said time, and would provide a different method of making payment from that provided in the contract and at a different time from that called for in the contract.

 It is well settled that a contract calling for the payment of a certain sum of money cannot, unless the other contracting party assents thereto, be lawfully satisfied or discharged except by a money payment.

Again, as already stated, during the progress of the work and to enable the plaintiff to perform its contract, the plaintiff, with the express consent of the city, not only borrowed the sum of $775,000 from the Reconstruction Finance Corporation but also placed a mortgage upon the property to secure the payment of said sum. The charter expressly provides that, where payment is to be made from funds to be derived from the issuance and sale of public market utility certificates, the city must first acquire full title to the property and then give a mortgage upon such property to secure the payment of such certificates. Under the facts stated in the complaint and because of said mort-

gage to the Reconstruction Finance Corporation, it was impossible, upon completion of this contract by the plaintiff, for the city to comply with that provision of the charter for, at that time, the property was incumbered by a mortgage for a very large sum of money which had been placed upon the property by the plaintiff with the consent of the city. This provision of the charter we are asked to ignore and treat the contract as if there were no such provision in the charter.

It is obvious from an examination of the two ordinances that, at the time the first ordinance was passed, the city intended to establish this market and to pay for the property by the issuance and sale of public market utility certificates and, if that plan had been adhered to, the city would not have had power to purchase the property in any other or different manner. But, by the ordinance last passed, it is equally obvious that the city decided to depart from that plan and provide a different method of payment for otherwise the council would not have approved a contract which required it to pay the sum of $1,244,790.66 at the time the deed and other conveyances were tendered and accepted by the city. Both the city attorney, who prepared the contract, and the council, in approving it, knew that that provision of the contract could not be fulfilled if the title to the property was first to be acquired by the city, then a mortgage subsequently given and certificates later issued and sold. To hold, therefore, that the city intended to pay said sum from moneys derived from the issuance and sale of public market utility certificates, which could not be sold before the payment became due under the express terms of the contract, is to convict the city attorney and the council of an entire disregard of their official duties. The only reasonable conclusion to be drawn from the

circumstances stated is that the city intended to make said payment from its general fund and afterward reimburse the general fund by a subsequent issuance and sale of public market utility certificates.

■ The charter provision that no contract binding the city to pay more than $250 shall be valid unless authorized by ordinance was complied with by the passage of the last ordinance which authorized the making of this contract. The contract was within the scope of the ordinance and was executed in accordance with that authority. There was no charter requirement that the resolution approving the contract should be by way of an ordinance. It was held in *Clinton v. City of Portland*, 26 Or. 410 (38 P. 407), that, where the charter commits the decision of a matter to the council, and is silent as to the mode, the decision may be evidenced by a resolution, and need not necessarily be by an ordinance, citing 1 Dillon on Municipal Corporations, 4 ed., 307. Under this decision, the approval of the contract by the council after it had been prepared by the city attorney was not required to be by ordinance. The council, having previously passed an ordinance authorizing the execution of the contract, had authority to approve the contract by resolution, as was done in this case.

The contention that, because the contract had not been prepared at the time the last ordinance was passed and, therefore, the making of the contract was not authorized, when made, by an ordinance of the city, if well taken, would make the contract invalid and unenforceable. To hold, therefore, as has been suggested, that the demurrer should have been overruled and an accounting been had, if the contract had no validity, as suggested, is so unreasonable that the mere statement of the contention refutes it.

■ Nor do we see any reason why the rule of *nosci-tur a sociis* should be applied in determining what was meant by the provision in the ordinance, "and upon such other terms and conditions as shall hereafter be determined by the council". Certainly, nothing which preceded those words in the ordinance requires the application of that rule. Nor does the case of *Traders' Insurance Company v. Dobbins & Ewing*, 114 Tenn. 227 (86 S. W. 383), cited in the dissenting opinion, have any relevancy or bearing upon the construction to be given to said clause. Rules applicable to a contract of insurance of certain described merchandise followed by a provision, "and such other merchandise as is usually kept for sale in a retail hardware store", can have no possible application to the powers of a city or to the construction to be given to an ordinance of the city in the exercise of such powers. Nor are we much impressed with the construction placed upon this contract, which entirely ignores the express promise to make the payment at the time the deed and other conveyances are tendered. That particular provision of the contract ought not to be done away with by any false construction placed upon the contract. It is a particular provision which, if inconsistent with some general provision, is, by force of the statute, controlling.

■ Under the facts alleged in this complaint, the plaintiff has been induced, in reliance upon the contract, to expend a very large sum of money and to borrow other moneys from the Reconstruction Finance Corporation. These moneys have all been due and owing by the city for several years and, in the meantime, the city has taken no steps to fulfill the contract upon its part. Under such circumstances, to hold that the plaintiff is not entitled to any equitable relief is equivalent

to saying that it has no remedy at all. For this reason, the demurrer to the complaint was improperly sustained. It must be borne in mind, however, that what we have said is based upon the record now before us, namely: a complaint challenged by demurrer. What defense, if any, the city may make to the complaint and the sufficiency of such defense, if one is made, is not now before us for consideration.

It must also be borne in mind that the allegations of the complaint for the purposes of this demurrer are admitted to be true and, under the record now before us, we are passing merely upon the sufficiency of the complaint. When the whole matter is presented after a trial upon the merits, this court reserves for determination what construction should be given to the contract and all questions involving the liability of the city.

For the reasons stated, the demurrer must be overruled and the cause be remanded for such further proceedings as are not inconsistent herewith.

BEAN, C. J., and BELT, KELLY and LUSK, JJ., concur.

BAILEY and ROSSMAN, JJ., dissent in part.

---

BAILEY, J. (dissenting in part). In interpreting the contract between Public Market Company of Portland and the City of Portland, certain well-known rules of construction should be kept in mind: 1. The intention of the parties to the contract is to be ascertained and given effect (§ 9-215, Oregon Code 1930). 2. "The circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown," so that the court may be placed in the position of those whose language it is to interpret (§ 9-216, Oregon Code 1930). 3. The

function of the court is "simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted" (§ 9-214, Oregon Code 1930).

We should also keep in mind the provisions of § 148 of the charter of the city of Portland, which provides that: "The City of Portland shall not be bound by any contract nor in any way liable thereon, unless the same is authorized by an ordinance and made in writing and signed by some person or persons duly authorized thereunto by the council".

In order to place ourselves in the position of the contracting parties and to discern their intention in entering into said contract, we shall take up in chronological order the events leading up to and culminating in the execution of the contract here involved. On August 5, 1931, the council of the city of Portland enacted ordinance No. 61192, the title of which reads as follows: "An ordinance providing for the issuance and sale of public market utility certificates of the city of Portland, Oregon, in an amount not exceeding two million five hundred thousand dollars ($2,500,000.00), to be hereafter dated as determined by the council by resolution, authorizing the execution of a trust mortgage against real property to secure said certificates, approving the form of said certificates and interest coupons thereon, and providing for the retirement of the certificates."

The first section of this ordinance recites that: "To provide funds for the purpose of purchasing and establishing a public market as a public utility, public market utility certificates shall be issued by the City of Portland" in an amount not exceeding $2,500,000. The ordinance proceeds to set forth the form of the certificates and the form of the interest coupons thereto

attached, and then recites that the certificates authorized by the ordinance "shall be secured by a trust mortgage covering the real property and the buildings constructed thereon and all equipment, furnishings and personal property owned by the city and used for the said public market". It is further stated that such certificates shall not be a general obligation of the City of Portland but shall be paid from the net revenue derived from the operation of the public market.

Section 6 of the ordinance is as follows:

"It is the purpose and intention of this ordinance that the city of Portland, Oregon, shall obligate itself to establish a public market in the city of Portland, Oregon, as a public utility and to purchase land and buildings and equipment therefor. At the time of the enactment of this ordinance the council had not selected any real property for use as a public market. Such selection shall hereafter be made by the council by ordinance and when so purchased the same is hereby declared to be a public utility and the city of Portland, Oregon, further obligates itself to establish and put into effect, in so far as its powers will permit, a sufficient schedule of charges for the use of said public market and the privileges and facilities offered in connection therewith to raise a sufficient annual revenue to meet the following expenses, to-wit:

"(1) A sufficient sum for the maintenance of said public market.

"(2) To meet the annual interest on all public market utility certificates authorized hereby.

"(3) To provide a sufficient sum for the annual retirement of the number of certificates specified herein."

Section 7 of the ordinance provides that said certificates shall be advertised and sold "after said public market shall have been established and constructed".

On October 10, 1931, ordinance No. 61566 was passed by the city council of Portland, with title thereof as

follows: "An ordinance selecting and designating certain real property for use as a public market and authorizing the purchase of said real property and the building to be constructed thereon and the equipment to be installed in said building upon the terms and conditions required by ordinance No. 61192, passed August 5, 1931, and upon such other terms and conditions as shall hereafter be determined by the council, and authorizing preparation, approval and execution of a contract with the Public Market Company of Portland, and declaring an emergency."

Section 1 of this ordinance is thus worded: "Conforming to the provisions of ordinance No. 61192, entitled . . . , the hereinafter described real property is hereby selected and designated for use as a public market and the purchase of said real property and a building to be constructed thereon and equipment to be installed in said building is hereby authorized from the Public Market Company of Portland, an Oregon corporation, owner thereof, upon the terms and conditions required by said ordinance No. 61192, and subject to the terms of the contract hereinafter referred to." Then follows a description of the real property.

Section 2 of ordinance No. 61566 provides that: "The mayor and auditor are hereby authorized to execute on behalf of the city a contract with the Public Market Company of Portland in conformity with the plans and specifications now on file with the auditor, subject, however, to such changes as may be determined by the city. Provided, however, that the form of said contract shall be prepared by the city attorney and said contract shall be approved as to form and contents by the council by resolution prior to its execution by the mayor and auditor."

The only remaining section of the ordinance is the one declaring an emergency.

The foregoing two ordinances are the only ordinances on the subject passed by the city council preceding the execution of the contract between the market company and the city of Portland. Therefore, to hold the city liable on its contract at all, either generally or otherwise, it would be necessary to find authorization for execution of the contract in one or both of these ordinances: § 148, charter of the city of Portland. The first of these ordinances, to wit, No. 61192, declared it the purpose and intention of the city to obligate itself to establish a public market as a public utility and to purchase land, buildings and equipment therefor, and provided the method of raising funds to purchase such public market, that is, by the issuance of public market utility certificates.

In conformity to the provisions of that ordinance the city council did, by ordinance No. 61566, designate the land on which the market was to be located and did authorize the execution of a contract with the market company, plaintiff herein, for the purchase of land and the buildings thereon located, as a public market. It is therefore appropriate at this point, before referring to the terms and conditions of the contract between the market company and the city of Portland, to examine the provisions of ordinance No. 61566 in order to ascertain the terms and conditions under which the city was authorized to enter into such a contract.

The title of that ordinance states as the purpose of the enactment the selection and designation of certain real property for use as a public market and the authorization of the purchase thereof "upon the terms and conditions required by ordinance No. 61192 . . . and upon such other terms and conditions as shall here-

after be determined by the council.'' It is suggested that by the use, in the title, of the words ''and upon such other terms and conditions as shall hereafter be determined by the council'' it was contemplated by the council that it had a right, when entering into such contract with the market company, to ignore the provisions of ordinance No. 61192. It is further asserted that the word ''other'' as used in that part of the title last above quoted means ''different'' and that the title of the act should be interpreted as authorizing the purchase of the property selected under the terms and conditions required by ordinance No. 61192 *or* upon such different terms and conditions as the council might determine.

The word ''other'' as defined by all the dictionaries and lexicographers has numerous meanings, depending upon the context in which it is found. In some instances it may mean ''different'', while again it may mean ''additional''. In the title of this ordinance the word ''other'' is preceded by the conjunction ''and'', which would indicate that it was used in the sense of ''additional'', although had it been preceded by the disjunctive ''or'', it might be construed to mean ''different'' or ''unlike''.

Further reason for holding that the word ''other'' as used in the title of ordinance No. 61566 has the connotation of ''additional'' is found in the fact that the word is immediately preceded by ''such'', which means ''similar'' or ''the same as previously mentioned or specified''. In this connection we quote from *Traders' Insurance Company v. Dobbins & Ewing*, 114 Tenn. 227 (86 S. W. 383), the following:

''The first or primary definition of the word 'such' given in the authority above referred to is, 'of that kind; of like kind or degree; like, similar.' Following

this definition is a short essay upon the expression 'such as,' which we have quoted above, and the two examples which we have copied, along with numerous other instances of the same kind. There is a secondary meaning of the word 'such,' which is given as 'the same as previously mentioned or specified'; 'not other or different.' We are of opinion, however, that the primary meaning of the word is the correct one to be applied in the present case, especially as the word 'such' is followed by the word 'as.' This meaning is strengthened by the use of the word 'other.' The words being read together as they stand in the clause, 'and such other merchandise as is usually kept for sale in a retail hardware store,' means articles in addition to those already mentioned; their kind being only limited by the provision that they shall be of a sort usually kept in retail hardware stores.''

See also: *In re Tidball*, 40 Fed. (2d) 560; *Ex parte Hull*, 18 Idaho 475 (110 P. 256, 30 L. R. A. (N. S.) 465).

It is a well-known rule of statutory construction that when an act or ordinance is ambiguous or subject to more than one interpretation, the title thereof may be looked to in aid of construction. It is also a familiar rule that anything contained in the title of the act which is not found in the body thereof, either expressed or implied, is surplusage and must be ignored. Turning now to the body of the ordinance, we find in § 1 thereof that the city council has ordained that, ''conforming to the provisions of ordinance No. 61192,'' certain described real property is selected and designated for use as a public market and that the purchase of said real property with the building constructed thereon and equipment installed therein ''is hereby authorized from the Public Market Company of Portland, an Oregon corporation, owner thereof, upon the terms and conditions required by said ordinance No. 61192, and subject to the terms of the contract hereinafter referred

to.'' There is nothing stated to the effect that the market property may be purchased on terms and conditions different from those contained in ordinance No. 61192.

The part just quoted does provide that the purchase shall be subject to the contract "hereinafter referred to", and we find in § 2 of this ordinance that the contract which the mayor and the auditor are authorized to execute on behalf of the city for the purchase of the property is subject to the requirement that the "building to be erected thereon and equipped by said Public Market Company of Portland" shall be "in conformity with the plans and specifications now on file with the auditor, subject, however, to such changes as may be determined upon by the city." There is no indication afforded by a reading of the entire body of the ordinance that the city council is authorizing the execution of a contract for the purchase of a public market on terms and conditions different from those provided in ordinance No. 61192. The last-mentioned ordinance did not attempt to set forth all the terms and conditions for the purchase of such public market, and it is only natural that there must be terms and conditions written into the contract in addition to, but not in conflict with, those contained in that ordinance.

The contract which is the subject of this litigation was entered into October 28, 1931, between the market company and the city of Portland. Section 1 of the contract is in part as follows:

"The company agrees that within fifteen (15) days after the city shall have secured the approving opinion of legal counsel and the authority of the city to issue and sell the public market utility certificates authorized by ordinance No. 61192, it will resume active construction of a public market building upon the real property in the city of Portland hereinafter more particularly

described, according to plans and specifications hereto attached".

After stating that the contract was executed by the market company through its duly authorized officer, the instrument recites, "and the said City of Portland has caused these presents to be executed by its mayor, attested by its auditor, pursuant to authority duly given under the terms of ordinance No. 61566 of the city of Portland, enacted on the 10th day of October, 1931, and effective on the 10th day of October, 1931, and resolution No. 20291, adopted October 28, 1931."

The agreement obligates the market company to construct a public market building upon the real property referred to and described in ordinance No. 61566, according to certain plans and specifications, under the supervision of the building inspector or city engineer of the city of Portland, with authority given the city to make alterations and changes in the said plans. It also obligates the market company to acquire and install in the said building, within ten days after the completion thereof, "equipment, materials and supplies" described in an exhibit attached to the contract, at an estimated cost of $46,000. The city agrees to pay the actual cost thereof plus ten per cent, "in addition to the principal sum to be paid the company, as hereinafter fixed".

The contract further provides that upon completion of the building and purchase and installation of equipment, materials and supplies, the market company shall convey to the city by warranty deed a good and marketable title to the real property and convey the movable fixtures and personal property by bill of sale, and the city agrees to "accept said conveyances and said

assignments" and to pay to the market company the sum of $1,244,790.66.

There is a further provision in the contract to the effect that "before the city acquires said public market building it shall be so occupied as to be a going public market utility." In order that the said building might be in use as a going concern, the market company was to perform "leasing services for the procuring of tenants" for the building.

Many other details are contained in the contract, among them the requirement for an accounting between the market company and the city covering the compensation to be received by the market company for its services in obtaining tenants, and the amount due to the city for rents received by the market company, also other matters necessitating an accounting.

The contract further provides that the title to be conveyed to the city "shall be subject to the unmatured intercepting sewer and drainage system assessments, which the city assumes and agrees to pay out of the revenues from said public market utility". There is also this provision: "It shall also be permissible for said title to be subject to taxes and assessments due and payable after November 5, 1931. The company agrees that it will pay all legal taxes, assessments and interest which become due and are payable after November 5, 1931, up to the time that it delivers title to the city, and the city agrees that it will reimburse said company from funds derived from the sale of public market utility certificates for all sums which said company shall pay for such taxes, assessments and interest, with interest at 6 per cent from the date of said payment or payments."

The conclusion seems inescapable that the contract between the market company and the city of Portland

contemplated that the market company should be paid out of funds realized from the sale of public market utility certificates issued in pursuance of ordinance No. 61192. That ordinance was passed pursuant to §§ 151, 153 and 155 of the charter of the city of Portland, and especially in pursuance of the last-mentioned section, which authorizes the city council to issue and sell public utility certificates for the acquisition by purchase or otherwise of any public utility to be operated within the city. Section 155 specifically provides that the said certificates shall not be a general liability of the city, but that the same shall be paid solely from the revenues derived from the plant or from the sale thereof, and further provides that the power thereby granted to the council shall be exercised only by ordinance.

The contract here involved must be construed in connection with the ordinance or ordinances authorizing the city to enter into such contracts. The authority to bind the city on this contract is found in ordinance No. 61566, which by its terms refers to and incorporates the provisions of ordinance No. 61192. In neither of these ordinances is found any provision which expressly or by implication authorizes the city to enter into any contract for the purchase of a public market utility to be paid for out of the general funds of the city or otherwise than through the issuance of public market utility certificates.

The contract before us states that the same is executed by the mayor and attested by the auditor pursuant to authority duly given under the terms of ordinance No. 61566 and resolution No. 20291. Resolution No. 20291 is to the effect that the contract here under consideration is approved as to form and contents, by the council. This is merely a resolution of the city coun-

cil which is signed by the auditor alone, and not signed by the mayor and attested by the auditor as required of ordinances by § 51 of the Portland charter. It can not be asserted that this resolution modified or superseded ordinance No. 61566.

There are other and persuasive reasons indicating that the parties to the contract intended that the funds to make payment under the contract were to be derived from the sale of public market utility certificates. By the terms of the contract the plaintiff is not only required to complete the market building but to provide the same with necessary furnishings and equipment, to obtain tenants and in general to do everything necessary in order to turn over the market as a going concern. With the market utility in that condition, the city would be in a position to dispose of the public market utility certificates. It seems somewhat strange, if the city intended to create a general obligation, that it did not purchase the land and let the contract for the construction of the building and the installation of equipment, fixtures and furnishings therein to the lowest responsible bidder.

In support of the contention that it was contemplated by the parties to the contract that the purchase price should be a general obligation of the city, not limited to the funds realized from the sale of utility certificates, plaintiff has directed attention to the provision in the contract which expressly requires that plaintiff shall be reimbursed out of funds derived from the sale of public market utility certificates, for taxes and assessments due and payable after November 5, 1931, and paid by plaintiff. It is argued that since the contract expressly provides that these charges shall be paid out of the funds derived from sale of the certificates and the contract is silent as to the manner of

payment of the other obligations under the contract, the parties to the contract must have intended that those other obligations were not to be limited to funds realized from the sale of such certificates but should be a general obligation of the city. Even to ignore for the moment the requirement in the city charter that before the city can be bound by any contract it must have authorized the same by ordinance, there still remains no valid reason to hold that by specifically providing for payment of the taxes and assessments out of funds realized from sale of the certificates the city undertook to pay to the plaintiff out of its general funds the remaining obligations incurred in connection with acquiring the market utility.

A number of reasons might be suggested for specifically providing for the payment of those taxes and assessments out of funds derived from the sale of public market utility certificates. It is apparent that the purchase price agreed to be paid for the real property and the building thereon located, to wit, $1,244,790.66, was not intended to cover taxes and assessments due and payable after November 5, 1931, which was the final date for the payment of taxes due and payable during the year 1931. Therefore, since the purchase price named in the contract did not include taxes due and payable subsequent to November 5, 1931, and since the contract specifically provided that the title conveyed might be subject to such taxes, it was only reasonable, in order that there should be no misunderstanding, to provide that the plaintiff should be reimbursed out of funds derived from the sale of the certificates, for the payment of those taxes.

It will further be noticed that immediately preceding the reference to the payment of taxes, the contract

provides that the title to the real property may be subject to the unmatured intercepting sewer and drainage system assessments, and expressly provides that these assessments be paid out of the revenues from the operation of the public market. Had the contract not contained a provision that the taxes and assessments due and payable after November 5, 1931, be paid from the funds realized from the sale of the certificates, it might be assumed that they should be paid out of the revenues from the operation of the public market, as previously specified with reference to the payment of the sewer and drainage system assessments.

By specifically providing the manner of discharging certain incumbrances existing against the property at the time of conveyance to the city, it is apparent that the city did not intend to assume any general obligation in connection with the acquisition or operation of the public market utility. Moreover, it is unreasonable to assume that the city undertook to pay the entire purchase price of the public market utility, except unmatured intercepting sewer and drainage system assessments and taxes and assessments accruing subsequent to November 5, 1931, out of its general funds, and that it was proposing to issue public utility certificates merely for the purpose of raising funds to pay such taxes and assessments. Regardless, however, of what might have been the intention of the city in this respect, we must look to the ordinances of the city to ascertain its authority for entering into the contract. As already pointed out, none of the ordinances which have been called to our attention permitted the city to acquire this public market utility otherwise than by the issuance of public market utility certificates. Any one who makes a contract with a municipal corporation is

bound to take notice of limitations of its power to contract.

The fact that the city, at the instance of the plaintiff, by resolutions Nos. 20557 and 20649, dated October 6, 1932, and April 13, 1933, respectively, subrogated its rights under the contract to the lien of the mortgage given by the plaintiff to secure the repayment to Reconstruction Finance Corporation of the sum of $775,-000 loaned by that corporation to the plaintiff, does not in any way affect the conclusion as to the necessary construction of the contract above announced. There is nothing recited in those resolutions which would tend to indicate that the city construed the contract between itself and the plaintiff as creating a general obligation on the part of the city to pay the purchase price of the public market. Both of the resolutions recite that the contract between the city and the plaintiff was entered into under authority of ordinance No. 61566 and resolution No. 20291.

It does not necessarily follow that the demurrer to the complaint should be sustained because the purchase price of the public market utility is payable from funds derived from the sale of public market utility certificates and from revenues derived from the operation of the market.

The allegations of the complaint, which are to be taken as admitted, are to the effect that the plaintiff, Public Market Company of Portland, has performed all the terms and conditions of the contract between itself and the city to be performed by it, and that the city has failed, refused and neglected to perform its part of the contract. The facts stated in the complaint clearly indicate that the plaintiff is entitled to an accounting against the city. Equity has jurisdiction of

such an accounting and the plaintiff is entitled to that relief, as the pleadings now stand. Whether or not plaintiff is entitled to require the city to perform specifically the terms of its contract by proceeding to sell or attempt to sell the public market utility certificates, or has a right to relief by way of mandamus or some other proceeding, it is not necessary at this time to determine. But before it would be entitled to any such relief, it would be necessary, or at least helpful, to have an accounting and determine the amount which the market company might have a right to collect from the city.

The demurrer, therefore, should be overruled and the cause remanded to the circuit court with permission to the city to file an answer to the complaint, if it so desires, in order to determine whether or not the plaintiff has fully performed its part of the contract, and to ascertain what relief, if any, should be granted the plaintiff.

ROSSMAN, J., concurs in this dissent.